UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Case No. 13-10262-DPW |
| v. | ) | |
| | ) | |
| MICHAEL P. O'DONNELL, | ) | |
| Defendant. | ) | |

**<u>UNITED STATES' POST-TRIAL MEMORANDUM</u>**

The United States respectfully submits this post-trial memorandum pursuant to the Court's orders on July 10, 2015 and July 14, 2015.

**<u>BACKGROUND</u>**

On September 11, 2013, a federal grand jury sitting in the District of Massachusetts charged defendant Michael P. O'Donnell (the "Defendant") with one count of bank fraud in violation of 18 U.S.C. § 1344.  Docket No. 3.  Prior to trial, pursuant to Rule 23(a) of the Federal Rules of Criminal Procedure, Defendant waived his constitutional right to a jury trial.  Docket No. 121.  Defendant also stipulated and admitted prior to trial that he engaged in a scheme or artifice to defraud or obtain money by means of materially false statements or misrepresentations, and did so knowingly.  Docket No. 120 at 1.  He specifically admitted to various facts and conduct described in and attached to his Trial Stipulation.  *Id*.  On July 15-16, 2015, this Court conducted a jury-waived trial in this criminal matter.  The United States now respectfully submits a post-trial brief and requests that, based on all of the evidence submitted at trial, including the Defendant's stipulations, this Court find the Defendant guilty of bank fraud beyond a reasonable doubt.

1

## ARGUMENT

**I.      The Defendant is Guilty of Bank Fraud under either Subsection of 18 U.S.C. § 1344.**

The Defendant is charged with one count of bank fraud in violation of 18 U.S.C. § 1344. 18 U.S.C. § 1344, in turn, provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
> **(1)** to defraud a financial institution; or
> **(2)** to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

A defendant may commit the crime of bank fraud one of two ways, as the disjunctive "or" between subsections (1) and (2) suggests. *Loughrin v. United States*, 134 S.Ct. 2384, 2391 (2014); *United States v. Adekoya*, 60 F.Supp.3d 294, 298 (D.N.H. 2015). Where, as here, the Indictment cites 18 U.S.C. § 1344 and references language from both subsections, the government may pursue a bank fraud conviction under either one. *See United States v. Fontana*, 948 F.2d 796, 801 (1st Cir.1991); *see also Turner v. United States,* 396 U.S. 398, 420 (1970) (reaffirming principal that where an indictment charges several acts in the conjunctive, a guilty verdict stands if the evidence is sufficient with respect to any one of the acts charged).

A defendant violates the first subsection of 18 U.S.C. § 1344 by: (1) engaging in a scheme or artifice to defraud (2) a federally insured financial institution, and (3) doing so knowingly and with the intent to defraud the financial institution. *Adekoya*, 60 F.Supp.3d at 298 (citing to *United States v. Benjamin,* 252 F.3d 1, 5 (1st Cir. 2001) and *United States v. Brandon,* 17 F.3d 409, 424 (1st Cir. 1994)). In contrast, a defendant violates the second subsection of 18 U.S.C. § 1344 when he/she: (1) engages in a scheme or artifice employing materially false and fraudulent pretenses to (2) obtain money or other property owned by, or under the custody or control of (3) a federally insured financial institution, and (4) does so knowingly. *Adekoya*, 60

2

F.Supp.3d at 298 (citing to *Benjamin,* 252 F.3d  at 5 and *United States v. Bah,* 587 Fed.Appx.

752, 753–54 (4th Cir. 2014)) (discussing elements of offense post-*Loughrin*).  Neither subsection

of 18 U.S.C. § 1344 requires the defendant's fraud to be successful.  *Loughrin*, 134 S.Ct. at

2393-94 ("[W]e have long made clear that such failure is irrelevant in a bank fraud case, because

§ 1344 punishes not 'completed frauds,' but instead fraudulent 'scheme[s]'") (quoting *Neder v.*

*United States*, 527 U.S. 1, 25 (1999)); *see also United States v. Brandon*, 298 F.3d 307, 311 -312

(4th Cir. 2002) (victim bank need not have suffered actual loss).

As outlined above, the bank fraud statute imposes criminal liability in two circumstances:

The first is an attempted or completed scheme to defraud a financial institution while the second

is a knowingly attempted or completed scheme to obtain funds by false pretenses or

representations.  *United States v. Adepoju*, 756 F.3d 250, 254-255 (4th Cir. 2014); *United States*

*v. Bah*, 587 Fed.Appx. 752, 754 (4th Cir. 2014) ("The major difference between the subsections

is that § 1344(1) focuses on how the defendant's conduct affects a bank, while § 1344(2) focuses

solely on the conduct.") (quoting *Adepoju,* 756 F.3d at 255); *see also Fontana*, 948 F.2d at 802

(only second prong of 18 U.S.C. § 1344, by its plain language, requires the showing of

fraudulent misrepresentations).  Thus, intent to defraud a bank is an element of § 1344(1) but **not**

of § 1344(2).  *Loughrin,* 134 S.Ct. at 2389–90 ("the *first* clause of § 1344, as all agree, includes

the requirement that a defendant intend to 'defraud a financial institution'; indeed, that is §

1344(1)'s whole sum and substance") (emphasis original); *Bah*, 587 Fed. Appx. at 754.

The First Circuit has held that the specific intent under § 1344 is an intent to defraud a

bank, "that is, an intent to victimize a bank by means of a fraudulent scheme."  *Brandon*, 17 F.3d

at 426.  Moreover, the First Circuit has clarified that "intent to defraud" does not necessarily

mean intent to harm but, instead, intent to deceive a bank through a scheme.  *United States v.*

*Kenrick,* 221 F.3d 19, 26–27 (1st Cir. 2000) (en banc), *abrogated on other grounds by Loughrin v. United States*, 134 S.Ct. 2384 (2014).   The government, however, is not required to show that the alleged scheme was directed solely toward a particular institution.   *Brandon*, 17 F.3d at 426; *Ayewoh*, 627 F.3d at 921 (specific intent to harm a particular bank not required; "proof of an extremely remote risk will suffice").   Instead, it is sufficient for the United States to show that defendant knowingly executed a fraudulent scheme that ***exposed*** a federally insured bank to a risk of loss.   *Brandon*, 17 F.3d at 426.   In other words, "it is also unnecessary for the government to prove that a defendant knows which particular bank will be victimized by his fraud as long as it is established that a defendant knows that *a* financial institution will be defrauded."   *Id*. (emphasis original); *see also United States v. Crisci,* 273 F.3d 235, 240 (2nd Cir. 2001) ("[t]he bank need not be the immediate victim of the fraudulent scheme") (per curiam) (internal quotation marks omitted).

In contrast to § 1344(1), § 1344(2) requires the United States to show that the defendant intended to obtain bank property by means of false or fraudulent pretenses, representations, or promises.   *Loughrin,* 134 S.Ct. at 2389.   Notably, "a conviction under § 1344(2) does not demand that the bank be the intended victim of the fraud; a person can violate the statute by obtaining funds from a bank while intending to defraud another person or entity."   *Adepoju*, 756 F.3d at 255; *see also United States v. Loughrin*, 710 F.3d 1111, 1116 (10th Cir. 2013). Moreover, the Supreme Court also has held that § 1344(2) does not require the defendant to seek to obtain money or property from the bank directly.   "[A] person violates § 1344(2)'s plain text by deceiving a non-bank custodian into giving up bank property that it holds."   *Loughrin*, 134 S.Ct. at 2389.   And while the First Circuit requires the government to show that a financial

institution was exposed to a risk of loss under § 1344(1), risk of financial loss is not a required element under § 1344(2).  *Loughrin*, 134 S.Ct. at 2395 n.9.

     A.     <u>The Defendant is guilty of bank fraud pursuant to 18 U.S.C. § 1344(1).</u>

To prove that Defendant violated 18 U.S.C. § 1344(1), the United States must establish that he: (1) engaged in a scheme or artifice to defraud (2) a federally insured financial institution, and (3) did so knowingly and with the intent to defraud the financial institution.  *Adekoya*, 60 F.Supp.3d at 298 (citing *Benjamin*, 252 F.3d at 5 and *Brandon*, 17 F.3d at 424).  By his own stipulation, Defendant already has admitted that he engaged in a scheme or artifice to defraud and did so knowingly.  Docket No. 120.  Thus, the only remaining element that the government must establish under this subsection is that Defendant intended to defraud a federally insured financial institution.

As a threshold issue, Defendant argued at trial that no federal jurisdiction exists in this case.  The First Circuit has made clear, however, that "the status of the victim-institution is not a separate knowledge element of bank fraud."  *Brandon*, 17 F.3d at 425.  In other words, the Defendant need not have known that the financial institution he was specifically targeting through his fraudulent conduct was federally insured.  Instead, whether Countrywide Bank, FSB (hereafter, "Countrywide Bank"), the victim-institution here, was a federally insured financial institution is "an objective fact that must be established in order for the statute to apply."  *Id*. Defendant has admitted and stipulated that Countrywide Bank was a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation at the time of the events alleged in the Indictment.  Docket No. 120 at 5; Docket No. 120-1; *see also* Ex. 11.01 (Countrywide Bank, FSB's Certificate of Proof of Insured Status).  The federal bank fraud statute, therefore, applies, and, contrary to Defendant's assertions, federal jurisdiction exists.

*Brandon*, 17 F.3d at 425 (where government produced evidence, and defendants did not dispute, that victim-institution was federally insured, First Circuit held such evidence was sufficient to satisfy requirement under 18 U.S.C. § 1344 that the defrauded bank be a federally insured bank).

Moreover, the evidence in this case established that Defendant knew he was putting a financial institution at risk.  The loan approval documents stated, "Thank you for submitting your loan to Countrywide Bank, FSB!  We sincerely appreciate your business."  Defendant received at least two such loan approval documents informing him that Countrywide Bank was considering the loan application he submitted on L.T.'s behalf for $44,000.  As Reade Morrison, the underwriter on the L.T. loan, testified, Ex. 1.12 was a preliminary approval of the L.T. loan application.  Morrison also testified that such document would have been faxed to Defendant since he was the broker, as all updates to a loan's status were sent to the brokers.  Defendant admitted that he received Ex. 1.12 and responded to the conditions by providing additional, fraudulent documents.  Docket No. 120 at 4.  Morrison also testified that the final approval (Ex. 1.17) would have been faxed to Defendant.  This second, final approval also thanked Defendant for submitting the loan at issue to Countrywide Bank.  Both approval documents were directed to AMEX Home Mortgage Corp., and Defendant's own so-called expert, Neill E. Fendley, admitted that approval documents such as Exhibits 1.12 and 1.17 would have been forwarded to the mortgage broker.  Indeed, Defendant's response to the preliminary approval and his submission of additional, fraudulent materials to satisfy Countrywide Bank's conditions established that he received and reviewed Ex. 1.12.

Defendant's Trial Stipulation and admission that he received and responded to Ex. 1.12 thus prove that, at a minimum, Defendant knew Countrywide Bank was involved beginning with the loan approval process.  The numerous loan closing documents, further detailed below, that

specifically define and list Countrywide Bank as the lender also established that Countrywide Bank was a financial institution that would be exposed to risk.  Whether Defendant truly believed that he was targeting Countrywide Home Loans or that he was confused about Countrywide Bank's role in the transaction is immaterial to establishing a violation of § 1344(1). Countrywide Bank's early involvement in the loan approval process, Defendant's receipt of loan approval documents thanking him for submitting the application to Countrywide Bank, and Defendant's carefully crafted and intentional response to the Bank's approval conditions established that Defendant knew he was defrauding either Countrywide Bank or both Countrywide Home Loans and Countrywide Bank.  *See United States v. Jack*, 216 Fed. Appx. 840, 843 (11th Cir. 2007) (affirming district court's denial of Rule 29 motion where, at closing, borrower signed document stating that uninsured lender would be selling loan to federally insured institution; circuit court held that based on borrower's business experience and his signing of the closing document explaining the loan's sale to a bank, jury easily could have inferred that defendant borrower knew fraudulent information would influence a federally insured institution engaged in a lending activity).  Based on Defendant's receipt of Exhibits 1.12 and 1.17 and his submission of additional fraudulent information to satisfy Countrywide Bank's preliminary approval conditions, the government has shown that he intended to deceive Countrywide Bank, which was a financial institution.

Additionally, there is no question that Countrywide Bank was exposed to financial risk. As the government submitted at trial, document after document throughout the loan process listed Countrywide Bank, and several of those documents clearly named Countrywide Bank as the lender on the loan at issue.  Indeed, the following 29 documents, all admitted into evidence at

trial, bore Countrywide Bank's name, and most were closing documents that Countrywide's

closing department prepared and that L.T. signed on the date of the loan's closing:

| Exhibit # | Title | Date |
|---|---|---|
| 1.02 | Mortgage (Line of Credit) | 4/20/2007 |
| 1.03 | Home Equity Credit Line Agreement and Disclosure Statement | 4/20/2007 |
| 1.06 | Uniform Residential Mortgage Loan Application | 4/20/2007 |
| 1.12 | Loan Approval for L.T. (3/26/07) | 3/26/2007 |
| 1.17 | Loan Approval for L.T. (4/12/07) | 4/12/2007 |
| 1.26 | Federal Reference # Receipt Form | 4/24/2007 |
| 1.27 | Loan Application Disclosure Acknowledgments | 4/20/2007 |
| Ex. 1.0 at 98 | Billing Rights Notice | 4/20/2007 |
| Ex. 1.0 at 99 | Affiliated Business Arrangement Disclosure Statement | 4/20/2007 |
| Ex. 1.0 at 106 | Important Terms of Our Home Equity Line of Credit | 4/20/2007 |
| Ex. 1.0 at 118 | Notice of Right to Cancel | 4/20/2007 |
| Ex. 1.0 at 124 | FEMA Standard Flood Hazard Determination | 3/21/2007 |
| Ex. 1.0 at 174 | Home Equity Confirmation Agreement | 4/20/2007 |
| Ex. 1.0 at 188 | Closing Instructions | 4/20/2007 |
| Ex. 1.0 at 221 | Closing Agent Disclosure | 4/20/2007 |
| Ex. 1.0 at 222 | Signature and Name Certification (L.T.) | 4/20/2007 |
| Ex. 1.0 at 223 | Signature and Name Certification (M.A.) | 4/20/2007 |
| Ex. 1.0 at 230 | Instructions to Title Company for Home Equity Loans | 4/20/2007 |
| Ex. 1.0 at 231 | Disclosure Statement about MERS | 4/20/2007 |
| Ex. 1.0 at 235 | Countrywide Privacy Disclosure | 4/20/2007 |
| Ex. 1.0 at 241 | Document Correction and Fees Due Agreement | 4/20/2007 |
| Ex. 1.0 at 242 | Instructions for Signing Home Equity Loan Documents | 4/20/2007 |
| Ex. 1.0 at 244 | Borrower Acknowledgement re. Effect of a Second Lien | 4/20/2007 |
| Ex. 1.0 at 245 | Hazard Insurance Requirements | 4/20/2007 |
| Ex. 1.0 at 249 | Appraisal Disclaimer | 4/20/2007 |
| Ex. 1.0 at 250 | Notice to Applicant re. Title Company and Closing Agent | 4/20/2007 |
| Ex. 1.0 at 251 | Schedule of Real Estate Owned | 4/20/2007 |
| Ex. 1.0 at 252 | Borrower's Certification and Authorization | no date |
| Ex. 1.0 at 254 | Identity Affidavit | 4/20/2007 |

In addition to Lanisa Jenkins' testimony that this home equity credit line agreement

(*a.k.a.* the promissory note) (Ex. 1.03) outlined the terms of the loan, Fendley himself

acknowledged that the note/agreement memorialized the loan's terms.  Further, the closing

instructions to the borrower, which explained her home equity credit loan documents and

directed her on how to complete them, stated what the agreement and mortgage were.

Specifically, these instructions provided:

> **1.     Home Equity Credit Line Agreement With Applicable Addendums**
> This document is your promissory note. It outlines your initial interest rate, credit limit, and terms and
> conditions of your loan. It also discloses the charges involved to obtain and maintain your credit line.

> **4.     Security Instrument (Mortgage/Deed of Trust) With Applicable Riders**
> This document secures your property as the collateral for this loan.

Ex. 1.0 at 242 (Instructions for Signing Your Home Equity Loan Documents).  As is apparent

from these instructions to L.T., the agreement outlined the terms and conditions of her loan.  The

agreement, in turn, and as Fendley conceded, stated that Countrywide Bank was lending L.T.

money, and that L.T. was agreeing to pay Countrywide Bank.  Ex. 1.03 at 1.  The mortgage also,

and as Fendley conceded, stated that Countrywide Bank was the lender on the L.T. loan.  Ex.

1.02 at 1.

> In contradiction to Fendley, who claimed that the settlement statement (*a.k.a.* "HUD-1")

was "the Bible" of the loan documents, the closing instructions explained the settlement

statement in the following manner:

> **5.     Settlement Statement/HUD-IA**
> This itemizes the costs incurred to obtain your equity line. This will include all Disbursements to Others,
> Disbursements to Borrower and any costs paid outside of closing (i.e. prepaids).

Ex. 1.0 at 242.  The HUD-1, thus, was merely an itemization of the costs and disbursements

related to the loan, and the credit line agreement – not the HUD-1 – outlined the terms of the

L.T. loan.  Moreover, every witness at trial, including Fendley, testified that the closing attorney,

not the lender, prepared the HUD-1.   Merely because the closing attorney mistakenly identified

Countrywide Home Loans on the HUD-1 as the lender instead of Countrywide Bank did not

make such mistake true and correct.  As can be seen in all 29 documents listed on page 8 above,

the documents generated by Countrywide consistently and repeatedly stated that Countrywide Bank was the lender on the L.T. loan.  Moreover, Countrywide, not the closing attorney (or any other third party, such as a title insurer) was in the best position to know which Countrywide entity was the lender on this loan.

Because Countrywide Bank was the lender, and because Countrywide Bank was the entity that L.T. was supposed to repay, Countrywide Bank was exposed to a risk of loss.  As Defendant admitted, he submitted a loan application containing material, false information about L.T.'s income, employment and assets.  Docket No. 120 at 3-4.  Indeed, the information that he submitted on L.T.'s behalf grossly distorted the truth: for instance, Defendant claimed that L.T. earned over $10,000 per month when in reality, she earned about $1,200 each month at that time.  Moreover, Defendant fabricated the Bank of America account statements, which he submitted with L.T.'s loan application, showing that L.T. had $50,000 on deposit, when she never had nearly that much in a bank account.  Defendant also stipulated that had Countrywide known that the information he provided on behalf of L.T. was false and fraudulent, Countrywide never would have approved the $44,000 loan.  *Id.* at 4.  Based on all of the evidence, including Defendant's admissions and stipulations, the government has established that Defendant's scheme exposed Countrywide Bank to financial risk (and risk that the lender never would have taken on but for the materially false and fraudulent information that Defendant submitted).  Such risk consisted of L.T.'s inability to repay Countrywide Bank back for its loan.

Defendant's defense at trial consisted of a mish-mash of arguments, including questioning which Countrywide entity was the lender on the $44,000 L.T. loan, contending that only Countrywide Home Loans employees processed the loan, claiming that Countrywide Home Loans funded the loan at issue, and asserting that the HUD-1, which listed Countrywide Home

Loans as the lender on the loan, was definitive and controlling in the transaction.  Such

arguments, however, missed the mark and failed to raise any – much less a reasonable – doubt as

to Defendant's guilt.  Under the first subsection of § 1344, the government is not required to

show that Defendant specifically aimed his fraud at Countrywide Bank instead of at

Countrywide Home Loans.  *Brandon*, 17 F.3d at 426; *Ayewoh*, 627 F.3d at 921.  Rather, the

United States only must show that Defendant knowingly executed a scheme to defraud (which he

admitted to), that such scheme to defraud would expose a financial institution to risk, and that

Defendant intended to deceive a financial institution.  *Brandon*, 17 F.3d at 426; *Kenrick,* 221

F.3d at 26–27.  As provided above, the government has proven this final element under

§ 1344(1).

        Moreover, § 1344(1) does not require the government to prove that Defendant focused

his scheme at a particular bank.  Instead, the United States only must establish that Defendant

knowingly executed a fraudulent scheme that ***exposed*** a federally insured bank to a risk of loss.

*Brandon*, 17 F.3d at 426.  Even a remote risk is sufficient.  *Ayewoh*, 627 F.3d at 921 (specific

intent to harm a particular bank not required; "proof of an extremely remote risk will suffice").

Thus, the United States need not establish that Defendant specifically targeted Countrywide

Bank with his fraudulent conduct but only that Defendant knowingly executed a scheme to

defraud that would expose a financial institution to a risk of loss, and that Defendant knew he

was putting a financial institution at risk.  Again, based on the evidence summarized above, the

United States has proven that beyond a reasonable doubt.

        B.      The Defendant is guilty of bank fraud pursuant to 18 U.S.C. § 1344(2).

        Not only has Defendant committed bank fraud pursuant to 18 U.S.C. § 1344(1), he also

violated § 1344(2).  As explained above, the second subsection of § 1344 focuses on the

defendant's conduct whereas the first subsection focuses on the effect of Defendant's conduct on a bank. *Adepoju,* 756 F.3d at 255. To prove a violation of 18 U.S.C. § 1344(2), the government must show that Defendant: (1) engaged in a scheme or artifice employing materially false and fraudulent pretenses, (2) to obtain money or other property owned by, or under the custody or control of (3) a federally insured financial institution, and (4) did so knowingly. *Adekoya*, 60 F.Supp.3d at 298 (citing to *Benjamin*, 252 F.3d at 5 and *Bah*, 587 Fed.Appx. at 753–54). Again, Defendant admitted that he engaged in a scheme or artifice to obtain money by means of materially false statements or misrepresentations and did so knowingly. Docket No. 120. Defendant also stipulated that Countrywide Bank is FDIC-insured. *Id*. at 5; Docket No. 120-1. Thus, the only remaining element that the government must establish under the second subsection is that Defendant's false and fraudulent pretenses were directed at obtaining money or other property owned by, or under the custody or control of, Countrywide Bank.

Under the second subsection, the United States need not show that Defendant intended to victimize Countrywide Bank. Defendant's argument that he aimed his false and fraudulent representations at Countrywide Home Loans, not Countrywide Bank, thus, is no defense under § 1344(2). Indeed, the Supreme Court found that § 1344(2) does not require the government to show that a defendant have a specific intent to deceive a bank. *Loughrin*, 134 S.Ct. at 2389 ("a person violates § 1344(2)'s plain text by deceiving a non-bank custodian into giving up bank property that it holds"); *see also Adepoju*, 756 F.3d at 255 ("a conviction under § 1344(2) does not demand that the bank be the intended victim of the fraud; a person can violate the statute by obtaining funds from a bank while intending to defraud another person or entity"). In other words, the government must show that Defendant attempted to acquire bank money through his fraudulent misrepresentations; whether Defendant knew that the money was Countrywide

Bank's, or under the Bank's custody and control, is of no importance under § 1344(2).

*Loughrin*, therefore, renders irrelevant Defendant's claims that he only dealt with Countrywide

Home Loans employees and that the loan documents referred to Countrywide Home Loans.

Defendant stipulated that he obtained money from the $44,000 L.T. loan.  Docket No.

120 at 4 ("O'Donnell received $37,392 directly from the [$44,000 loan] proceeds by a check

payable to AMEX Home Mortgage, along with an additional $1,198 in fees").  The government

also proved at trial that proceeds of the $44,000 loan were Countrywide Bank's or, at a

minimum, under Countrywide Bank's custody and control.  First, and as detailed above in

Section I.A., Countrywide Bank was the lender on the loan at issue.[1]  The Home Equity Line

Agreement unequivocally stated that Countrywide Bank was agreeing to lend L.T. money.  Ex.

1.03 at ¶ 1.  Under the Agreement, L.T. also promised to pay Countrywide Bank for the loan.  *Id.*

at ¶ 3.  The Mortgage, which Fendley agreed was the instrument that secured the L.T. loan with

real property, defined Countrywide Bank as the Lender.  Ex. 1.02 at 1-2.  The Borrower's

Certification & Authorization clearly stated that L.T. was applying for a mortgage loan from

Countrywide Bank, again defined as the Lender on the loan.  Ex. 1.0 at 252.  The Closing

Instructions, sent to the closing attorney prior to closing, stated that Countrywide Bank was the

Lender (Ex. 1.0 at 188) and specifically instructed the attorney to have the title insurer list the

name of the insured as "Countrywide Bank, FSB" (Ex. 1.0 at 195, ¶ C.4).  Moreover, based on

Jenkins' trial testimony and her explanation of Ex. 13.03, Countrywide Bank directed

Countrywide Home Loans to wire the loan proceeds and then reimbursed Countrywide Home

Loans for the wire the month after the loan closed.  One of the closing documents even identified

---

[1] Even Defendant's sole witness acknowledged that Countrywide Bank held the loan at issue.
While Fendley testified that Ex. 13.03 showed the loan transfer "back to" Countrywide Home
Loans and then to a pool of loans destined to be sold, he conceded that Countrywide Bank was
the entity that had the authority to transfer L.T.'s loan.

Countrywide Bank as the lender using its FDIC Insurance Certificate Number ID number.  Ex.

1.0 at 124-25 (FEMA Standard Flood Hazard Determination listing the lender as Countrywide

Bank and its lender ID number as 33143); Ex. 11.01 at 3 (Countrywide Bank, FSB's Certificate

of Proof of Insured Status, listing its FDIC lender ID number as 33143).[2]  Thus, based on this

evidence, Countrywide Bank was the entity that provided the loan to L.T., and the loan proceeds

that Defendant obtained were Countrywide Bank's.

Defendant relies heavily on the fact that the loan proceeds were wired from a

Countrywide Home Loans bank account to the closing attorney.  But Jenkins testified that

Countrywide Bank directed Countrywide Home Loans to transfer the loan proceeds.  Her

testimony is corroborated both by Countrywide Bank's Federal Reference Receipt Form (Ex.

1.26) and Bank of America's internal wire detail (Ex. 13.01), listing Countrywide Bank as the

directing party.  Not only did Countrywide Bank direct the transfer of the funds to the closing

attorney, but it also controlled the disbursement of those funds.  The loan Closing Instructions

specifically stated that "[u]nder no circumstances may Settlement Agent disburse the Loan

Proceeds PRIOR TO OBTAINING LENDER AUTHORIZATION."  Ex. 1.0 at 205, ¶ G.3

(emphasis original).  Those same Closing Instructions defined "Fund" in the following manner:

  c.  "Fund" or any capitalized derivative of the word means the act of Lender authorizing Settlement Agent to Disburse the
       Loan Proceeds.

Ex. 1.0 at 192, ¶ B.1.  As the loan's Closing Instructions stated, only the Lender had the

authority to allow the loan proceeds to be disbursed.  And by definition, the Lender (*i.e.*,

Countrywide Bank) "fund[ed]" the loan when it authorized the settlement agent to disburse the

proceeds.  Countrywide Bank, therefore, funded the $44,000 loan because Countrywide Bank

---

[2] The instructions for completing the FEMA Standard Flood Hazard Determination stated,
among other things, that "[t]he lender funding the loan should identify itself as follows: FDIC-
insured lenders should indicate their FDIC Insurance Certificate Number . . ."  Ex. 1.0 at 125,
Section 1.

was the entity that exercised authority over when such proceeds would be wired and disbursed. As the Lender and entity funding the loan, Countrywide Bank, and not Countrywide Home Loans, had custody and control of the loan proceeds.  By knowingly employing materially false and fraudulent pretenses to obtain such money, Defendant thus violated § 1344(2).

C.      The Countrywide Bank Loan to L.T. was an Integrated Transaction.

The evidence at trial established that, contrary to Defendant's position, both Countrywide Home Loans and Countrywide Bank played roles in the L.T. loan transaction.  Countrywide Home Loan's employees reviewed the loan application and performed the underwriting and other processing tasks.  According to former Countrywide Home Loans employee Reade Morrison, the underwriting standards he applied in approving loans – including L.T.'s - was the same whether the lender was Countrywide Home Loans or Countrywide Bank.  Moreover, Countrywide Financial Corporation's 2007 Annual Report on Form 10-K reflected that the parent entity considered both Countrywide Home Loans and Countrywide Bank to be part of its Mortgage Banking Segment (Ex. 53 at 9/378) and that loans were funded through both (*id*. at 79/378).

Every closing document for the L.T. loan prepared internally by Countrywide Home Loans' employees, including, most importantly, the loan Agreement and Mortgage, identified Countrywide Bank as the lender.  As established at trial and explained above, Countrywide Bank directed Countrywide Home Loans to wire the funds to the closing attorney from one of Countrywide Home Loans' bank accounts, but Countrywide Bank controlled the disbursement of those funds.  And as Jenkins testified, approximately 30 days after the loan closed, Countrywide Bank reimbursed Countrywide Home Loans.  Exs. 13.03 and 13.02.

In *United States v. Edelkind*, the First Circuit held that the bank fraud statute applies "where the federally insured institution takes part in an integrated transaction and is thereby injured by the defendant, who intended to defraud another party to the transaction."  467 F.3d 791, 797-98 (1st Cir. 2006).  *Edelkind* held that the bank fraud statute applied because the non-federally insured mortgage broker (Fairmont) only agreed to make the loan if the federally insured bank (Lehman Brothers) first agreed to purchase it, Lehman Brothers' forms and guidelines were used by Fairmont in approving the loan, a Lehman Brothers official signed off on the loan before Fairmont made it, and the transfer of the mortgage to Lehman Brothers occurred about a month after the closing.  *Id*.  The First Circuit concluded that the loan was, from the outset, part of an "integrated transaction" dependent on Lehman Brothers' prior approval and the subsequent planned mortgage transfer to Lehman Brothers.  *Id*.

The nexus between Lehman Brothers and Fairmont was far more attenuated compared to the nexus between Countrywide Bank and Countrywide Home Loans in this case.  In *Edelkind*, Fairmont not only funded the $3.3 million loan but was the lending party at closing.  *Id*. at 793-94.  Moreover, Fairmont did not transfer the mortgage to Lehman Brothers until about a month after the loan closed.  *Id*. at 798.  In contrast, Countrywide Bank was involved no later than when the loan was conditionally approved, just six days after the application was received.[3]  Furthermore, Countrywide Bank directed where the loan proceeds would come from and controlled their disbursement.  Countrywide Bank also was a formal party to the loan (*i.e.*,

---

[3] The First Circuit makes clear that even if Defendant submitted a dishonest loan application to Countrywide Home Loans, an entity which was not federally insured, he cannot escape liability under 18 U.S.C. § 1344.  Where the connection between a defendant and the federally insured victim was tight, and a mortgage fraud perpetrated against a non-federally insured entity was effectively a fraud against the federally insured institution, an individual commits bank fraud. *United States v. Walsh*, 75 F.3d 1, 9 (1st Cir. 1996).

identified on the note and mortgage as the lender) at the time of closing in this case and did not simply acquire the mortgage in a subsequently transaction, as Lehman Brothers did in *Edelkind*.[4]

Defendant's attempt to identify Countrywide Home Loans as the sole player in the L.T. loan simply ignores the substantial, undisputed evidence of Countrywide Bank's involvement. Defendant is "essentially seeking to sanitize [his] fraud by interposing an intermediary or an additional victim between [his] fraud and the federally insured bank." *Brandon*, 17 F.3d at 426-27. But as the First Circuit explained in *Brandon*, "[t]he fact that it should turn out that the financial institution actually defrauded was federally insured is a fortuitous stroke of bad luck for the defendants but does not make it any less of a federal crime." *Id*. As in both *Brandon* and *Edelkind*, the Court should reject Defendant's specious attempt to escape the reach of the bank fraud statute and find that, at a minimum, the loan at issue was an integrated transaction and, therefore, the Defendant is guilty of violating 18 U.S.C. § 1344.

---

[4] *Edelkind*'s "integrated transaction" theory has since been used in two published opinions to analyze the inter-relationship of federally insured and non-federally financial institutions each having some connection to a charged bank fraud scheme. *United States v. Wilkerson*, 587 Fed. Appx. 703 (3rd Cir. 2014) (finding evidence of bank nexus sufficient to affirm conviction on facts similar to *Edelkind*); *United States v. McCloskey-Diaz*, 824 F.Supp.2d 269 (D. Puerto Rico 2011) (denying motion to dismiss after detailed analysis of loan transactions involving four sets of federally insured banks and non-federally insured mortgage companies).

## CONCLUSION

For the reasons set forth above, and based on the Defendant's Trial Stipulation (Docket No. 120) and on the evidence submitted at trial, the United States respectfully requests that the Court find defendant Michael O'Donnell guilty of bank fraud in violation of 18 U.S.C. § 1344.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:      /s/ Veronica M. Lei
MARK J. BALTHAZARD
BBO # 544463
Mark.Balthazard@usdoj.gov
VERONICA M. LEI
BBO # 673122
Veronica.Lei@usdoj.gov
Assistant U.S. Attorneys
U.S. Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210

Date:   July 20, 2015

## CERTIFICATE OF SERVICE

I, Veronica M. Lei, Assistant U.S. Attorney, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

 /s/ Veronica M. Lei
Veronica M. Lei

Date:  July 20, 2015