**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | No. 1:13-cr-10262-DPW |
| **MICHAEL P. O'DONNELL**, Defendant. | |

**DEFENDANT'S POST-EVIDENCE MEMORANDUM**

The Defendant, Michael O'Donnell, by and through undersigned counsel, respectfully submits this Post-Evidence Memorandum in support of his contention that the Government has failed to prove beyond a reasonable doubt that he violated 18 USC § 1344. More specifically, the Defendant maintains that the evidence plainly does not demonstrate that with regard to the first clause of section 1344, he utilized a scheme with the intent to defraud a "Financial Institution" (as defined, in relevant part, as a bank insured by the Federal Depository Insurance Corporation (FDIC)), nor that he intended to obtain "Bank" property <u>by means of</u> (underscoring added) a false statement or misrepresentation in contravention of the second clause of §1344. <u>See,</u> <u>Loughrin v. United States</u>, 134 S. Ct. 2384 (2014). The <u>Loughrin</u> Court noted that the term "by means of" a false statement or misrepresentation is effectively a mechanism by which a court can essentially make a line drawing/policy decision whether or not a particular transaction actually places the federally-insured entity's money or property at risk and thus provides a sufficient nexus to federalism for the assertion of federal jurisdiction pursuant to § 1344. Parenthetically, the Defendant reiterates that not only did he did not directly make any misrepresentations to the federally-insured entity (Countrywide Bank FSB, (CWB), but he did

1

not even communicate with it. In point of fact, CWB provided no money or property for the subject Toribio loan that was subject to or at risk of being obtained by anyone, much less the Defendant, by false statement or misrepresentation. And, it is axiomatic that the victim of an offense under § 1344(2) must be the federally-insured institution, which did not happen here. See Loughrin, Id. at 14-15. Thus, CWB at no time material hereto provided any funds for the subject $44,000 Toribio loan, not directly at the funding by Countywide Home Loans (CWHL), and there is also no evidence that the CWHL funding was subject to a pre-arranged re-imbursement by CWB to CWHL presumably pursuant to some "integrated transaction" model. Nor, did CWHL, the non-federally insured Lender, ever act as a custodian for, or in control of, the federally-insured CWB's money or property, used by CWHL to fund the loan in any other respect.

Although the evidence herein demonstrates that no funds were ever transferred from the federally-insured CWB to the uninsured, CWHL, by an "integrated transaction" or by any other means for that matter, assuming, solely arguendo, that CWB at some point purchased this loan from CWHL by reimbursing to CWHL the $44,000 loaned by CWHL to Toribio, the preconditions for the establishment of a valid "integrated transaction", as contained *inter alia* in sections 23A and B of the Federal Reserve Act as implemented by Regulation W, and as testified to by defense witness Neill Fendley, as well as being contained in Defendant's Exhibit 53 (2007 10K for Countrywide Financial Corp.) were never satisfied. Conspicuously absent from this transaction is any participation whatsoever by CWB through its employees in the loan origination/acquisition, processing, underwriting/evaluation, servicing, as well as the funding, as well as by no utilization of any CWB forms, protocols, or systems. This would include no approval of the Toribio loan prior to its funding by CWHL subsequent to a thorough pre-

approval evaluation by exclusive CWB underwriters required by applicable federal regulations. There is also no evidence of any pre-arranged or a detailed plan or contract to acquire the CWHL subsequent to the non-existent CWB evaluation of the loan.

In 2007, Reade Morrison worked on the Toribio home equity line of credit (HELOC) loan at issue. The amount of the loan was $44,000. Morrison, an underwriter for CWHL, cleared the loan to close, writing "CTC" on exhibit 1.17 which caused the loan to be forwarded to Diane Cronin at the Closing Department of CWHL. Morrison knew Ms. Cronin to be a long-time employee of CWHL. Ms. Cronin would then create an array of closing documents, and she printed the closing documents that comprise Exhibit 1. Morrison believed that the Toribio loan was made by CWHL. He was "surprised" to see that CWB was listed as the Lender in some, but not all of the, loan package documents. As far as Morrison knew, all of the people working with him in the CWHL office in Danvers were employees of CWHL. Morrison indicated that all of the forms for the Toribio loan, were generated by the CWHL systems and personnel. Morrison testified that "CWB" did not maintain an office within the CWHL office in Danvers. He later noticed that his signature appeared adjacent to the name CWB on some of the documents, but he insists he believed himself to be an employee of only CWHL. No evidence to the contrary was adduced at trial, or exists that we know of, that he (or Lanisa Jenkins, discussed infra) were ever employee(s) of any CW entity other than CWHL. With regard to the loan package documents which listed CWB as the Lender, be noted that even those that were in fact on CWHL forms and referred to CWHL repeatedly in the body of the document.[1] Morrison had no reason to believe that any CWB personnel reviewed or processed any of the documents in the Toribio loan

---

[1] It is noteworthy that at least three of the main documents bear the name of CWHL as lender - the two title insurance documents and the HUD-1. The mortgage and note, which have CWB as lender, were expressly prepared by CWHL employee Diane Cronin, of the Closing Department.

package or, ever even briefly, considered the credit-worthiness of the borrower or of the loan. It is noteworthy that for loans originated and funded by CWB, the loan money would come from CWB, as CWB is itself a bank. CWHL on the other hand funded its own loans through an account at the Bank of New York. The Toribio loan was funded, as Morrison observed in the closing instructions prepared by Ms. Cronin, by CWHL, by wire transfer from this account at the Bank of New York, to the closing attorneys McGonagle and McGonagle in Massachusetts.

Lanisa Jenkins testified that she is a Vice President with Bank of America's (BOA) Business Support Operations Division, apparently Ms. Jenkins worked for CWHL from 1983 until 2008, with four consecutive years as an independent mortgage broker elsewhere during this time period. However when cross examined, she inexplicably claimed she did not know for which CW entity she worked, for 20+ years, as she had never actually seen her W2 form.[2]

Ms. Jenkins testified that CWHL and CWB were both subsidiaries of Countrywide Financial (CWF). According to Ms. Jenkins, CWB began financing HELOC loans prior to this loan, and first mortgages later. According to Jenkins in the period around the Toribio loan, CWHL also financed mortgages concurrently.[3] Ms. Jenkins testified that the entity which

---

[2] It is actually more than curious that a Vice President in charge of litigation liason for BOA would not know which CW entity employed her. One would expect that during the approximately 20+ years she worked there in various positions that she would have learned which of the separate independent CW corporations employed her. Perhaps she could have learned this from among any of the following: looking at her employment contract, looking at her office stationary, looking at the sign on the building, listening to how the phone was answered, reading or preparing her state or federal tax return, preparing her own CV or reading it, viewing her own website or social media sites, filling out an application for credit including loans for automobiles or homes, applying for credit cards, reviewing her credit reports, reading a professional letter sent to her or sent by her, being asked this question in the hundreds if not thousands of times it came up in the 20+ years she worked there, or remembering what answer she gave while testifying in the many courts at which she has testified in the past. The Defendant is providing this non-exhaustive list to emphasize the lack of candor and credibility for an individual, in her position, to answer under oath at a trial, particularly of this magnitude that she never knew which company she worked for because she never saw her W-2. It suggests a lack of respect and willingness to answer questions honestly and strains that stretches credulity and calls into question her candor to this Court. This also provides insight into certain other "curious" responses she gave throughout her testimony, as discussed infra.
[3] A breakdown of mortgage loans made in 2007 contained in Exhibit 53, between CWHL and CWB suggests that as CWF was transitioning its mortgage loans to CWB in 2007, (arguably largely due to the fact that CWHL had been

initially funded the money to the borrower would be considered to be the lender. And, while she initially pointed out that CWB was listed as the lender of the Toribio loan in several documents, in one of her last answers in cross-examination, she conceded, albeit reluctantly, that CWHL had funded the Toribio loan and was, in fact, the lender.

Upon request from the Government, Ms. Jenkins examined the data in the BOA computer system and produced three "screenshots" pertaining to the Toribio loan. Ms. Jenkins testified that she was familiar with the screen referred to in exhibit 13.03 as depicting the (re)funding of the Toribio loan, showing the amount of $43,784.08 being transferred to CWHL from CWB, presumably to reimburse CWHL for its $44,000 loan to the Toribio. The second page of the exhibit included a notation of "HFS" that Ms. Jenkins indicated was an acronym which meant the loan was to be "held for service."[4]

Ms. Jenkins reviewed a document, entitled "Broker-Approved Checklist Values" in Exhibit 1.00, which was captioned in CWBC, Ms. Jenkins testitifed on direct examination that CWBC stood for "Countrywide Bank", relevant, *inter alia* because it was some further indication that CWB was participating more significantly in the Toribio loan and using its own CWB forms. However in cross examination, it was pointed out, from the document itself, to Ms. Jenkins that CWBC denotes an independent corporate entity called "Countrywide Wholesale Business Channel", not Countrywide Bank, and "CWBC" was its registered trademark(®). Even after seeing the document with CWBC's registered trademark and its actual name, Countrywide Wholesale Business Channel spelled out, while she agreed that such was probably the case

---

sued repeatedly by state Attorneys General, Federal authorities, and private plaintiffs including class actions, for its unfair and deceptive lending practices, and its name and reputation were greatly challenged,. However, CWHL still made the majority of mortgages for the first two quarters of 2007, while CWB made the majority of mortgages in the last two quarters of 2007. The transition to CWB was completed in 2008. See Exhibits 53@ p. 64 and 378.

[4] As discussed, <u>infra</u>, HFS actually means "held for <u>sale</u>", underscoring added.

(despite admittedly not knowing what a registered trademark meant or its implications), she nevertheless continued to maintain that Countrywide Bank was known as CWBC as well to many at CWHL. Upon further cross examination in which Counsel suggested that even if in the CWBC, the first "C" denoted "Country", the "W" denoted "Wide", the "B" denoted "bank", what would the last

"C" mean? Ms. Jenkins was initially unable to respond. As Counsel turned away from the witness stand to return to the podium, she blurted out "Corp." suggesting the CWBC still stood for "Countrywide Bank Corp". The relevance of this exchange is that not only Countrywide Bank is known as CWB FSB, not CWBC, or that CWBC is uncontrovertibly Countrywide Wholesale Business Channel, registered and trademarked, all of which was also noted in Mr. Fendley's testimony, but that Ms. Jenkins is evidently more than willing to impulsively make unsupportable statements (that she apparently believes will support her position) and maintain stanchly maintain them often against reason, which we respectfully suggest is highly discrediting of Ms. Jenkins and of all of her testimony.

Ms. Jenkins was questioned about the screenshot in Exhibit 13.03. She explained that she did not print the third screen which would have showed the ultimate account to which, in her opinion, the funds were transferred, because she had not been asked to do so by the Government. Nor had Ms. Jenkins obtained any bank records to support the assertion that these transactions noted on the screenshot were actual money transfers between accounts. Ms. Jenkins stated that she sent an email to someone whom she could not identify asking the Bank of America accounting department for such records but had not obtained them because they were outside of the seven year retention period for bank records and were therefore "purged." She did not request such bank records from CWHL's account at the Bank of New York where they most

probably archived. She also did not even request corroborating the purported wire transfers in the screen shot copies despite having worked in the CWHL warehousing department where she expressly gained experience dealing with just such wire transfers. She appears to us, at best, to not want the information. But the notion that the Government didn't ask for it, so she didn't seek it, one more of her extremely problematic answers to important questions. We feel quite certain that the Government wanted any and all information relevant to explain the meaning of the screen shots.

In sum, she did not delve further into the issue, and did not check if the CWHL's bank's records existed at the Bank of New York whether the wire transfer records might still exist. It is also worth noting that all the other records in the screenshots reflect data that was entered into the Bank of America system and evidently stored past the seven year retention period which Ms. Jenkins provided as the reason the potentially exculpatory records were now unavailable. Ms. Jenkins arguably only sought out the electronic evidence which would tend to support the Government's theory and had to selectively mis-state it and distort it to even make that happen. There is absolutely no question that this was not done with the knowledge, or complicity of the Government.

With regard to her testimony that "HFS" meant "held for service", Ms. Jenkins testified that she thought that was what the acronym meant but to be sure, on cross examination stated that she thought that she "instant messaged" a woman who confirmed that HFS meant "held for service" and not "held for sale" even though by all accounts the Toribio loan was transferred/sold almost immediately to CWHEQ (the screen shot that she didn't print because nobody asked her to) by CWHL. When asked in cross examination the name of the trusted colleague that she made the HFS inquiry of, she couldn't immediately recall the first name,

7

finally said "Maciel or something like that", couldn't at first recall the last name either, and when pressed by Counsel answered that she "wanted to say Garcia" or something to that effect. Of course given that this vague exchange would have occurred in the past 2 ½ months rather than years ago, one would expect a more complete memory. And, that this exchange is alleged to have occurred over "instant messaging" rather than through personal or corporate email with greater possibility for corroboration is noteworthy.

With all respect, Ms. Jenkin's testimony is replete with errors and with selective memory at best and with a surprising lack of sophistication for a Vice President of Bank of America managing their wide ranging litigation. That she cannot state at which CW entity she worked for 20+ years, cannot admit that she is wrong with HFS dispute along with fact checking with her semi-anonymous colleague, wrong about CWBC, and blurting out "C" stands for "Corp." as Counsel was walking away from her, doesn't know what an "integrated transaction" is although it would be an important part of figuring out the "who is the lender" calculus, doesn't know what "table funding" is, doesn't know the impact of Regulation W and Rules 23A and 23B of the Federal Reserve Act which it implements, and which impact under what circumstances and conditions federally insured entities such as CWB and Bank of America may acquire loans of affiliate companies like CWHL, is surprising if not discrediting. And her assessment of the screenshots, particularly Exhibits 13.02 and 13.03, not only runs completely counter to the testimony of Neill Fendley, but runs counter to common sense - Exhibit 13.03 is entitled "Loan Transfer Display Screen" and clearly is referring to a transfer of the Loan, which means note and a mortgage. Keeping in mind that Ms. Jenkins never even printed the last screen or at least did not provide it to the Defendant presumably realizing it would be adverse to the stated position she was espousing.

Neill Fendley testified for the Defendant. He was engaged in the mortgage business for over 30 years, first as a broker and later as a consultant in compliance, fraud analysis and expert testimony. He testified before Congress concerning secondary markets nine times between 2001 and 2004/2005. He was a consultant to the FBI for a number of years. As a broker and correspondent lender working with CHL, Fendley had outside access to CWHL's computer systems and was familiar with their operation. Fendley submitted hundreds to thousands of applications for loans to CWHL and has been a lender/co-lender on a similar number of loans to CWHL borrowers.

Mr. Fendley testified that the screen shot in Exhibit 13.03, the "Loan Transfer Display" was of a computer tracking form which tracked loans through the Countrywide entities as they progressed to the secondary market and which he had used on numerous occasions to track loans he himself had sold to CWHL. This form showed Toribio HELOC loan note and mortgage were assigned/transferred to CWHL and then bundled together with other HELOC loans and moved to CWHEQ and sold in the mortgage backed securities secondary market as part of a $900 million pool. Mr. Fendley testified that absolutely no money ever was paid by CWB to CWHL or to any other entity in connection with the subject Toribio loan.

He testified that the reference to CWBC was to that of an entity called Countrywide Wholesale Business Channel which received loans from outside brokers, as opposed to retail loan applications. Mr. Fendley testified that he had never heard any Countrywide entity referred to as Countrywide Bank Corporation, and that CWB was known universally as Countrywide Bank FSB. This testimony is also repeatedly corroborated in Exhibit 53, (the 2007 10K of Countrywide Financial).

Mr. Fendley was familiar with the acronym "HFS" which meant "held for sale" which was generally the status of HELOC loans made by CWHL. Making reference to the 2007 10K Annual Report filed with the SEC by Countrywide Financial, Mr. Fendley testified that there were two types of loans made by CWHL; those that were "HFS" meaning "held for sale," and those designated "HFI" or "held for investment." CWHL, according to Mr. Fendley, serviced loans but did not "hold them" for service. Further, any reference to "servicing loans" in Exhibit 53 relates to the ubiquitous servicing of loans in the CW portfolio-not that there was a term "held for service" in the 10K report, or anywhere.

The Toribio loan, according to Mr. Fendley's review of the documents, was funded as requested in the CWHL closing instructions, by CWHL's source account at the Bank of New York. Although CWB is referenced in the closing documents and the loan approval form signed by CWHL underwriter, Reade Morrison and contained in Exhibit 1.00, Mr. Fendley observed that it did not appear that CWB had any actual involvement in the loan. Specifically, he noted that CWB had no personnel reviewing the loan application, had no role in the approval process, did not participate in the preparation of closing documents, and as noted did not provide the funding. Reade Morrison and Diane Cronin were both CWHL employees. Mr. Fendley noted that the conditions precedent to closing contained in exhibit 1.12 were all dictated by CWHL. Similarly, once approved by CWHL long time employee Reade Morrison to progress to closing, the final loan approval letter to the Defendant's company Amex Home Mortgage Corp. included no mention of CWB. Rather, the body contained the reference to CWBC which meant Countrywide Wholesale Business Channel, the entity which accepts loan applications from outside brokers for CWHL as opposed to "retail" originations. Again it bears absolutely no relation to CWB FSB; if it did the confusion would be significant and be violative of the

10

registered trademark. Mr. Fendley indicated that the "bible" for the loan process was the HUD-1 form contained in Exhibit 1.00, which indicated CWHL as the lender of the Toribio loan. In response to the Court's query, Mr. Fendley indicated that he found no evidence whatsoever that "any funds" were provided by CWB FSB toward the Toribio loan.

Based on Mr. Fendley's extensive experience with CWHL generally and more specifically with the CWHL computer systems such as Clues and the Loan Transfer Display Screen referenced in exhibit 13.02 and 13.03, he testified that no loan funds came from CWB for the Toribio loan. Recalling that the original loan amount was for $44,000, the fact that the "Loan Transfer Display" screen indicates the reduced amount of $43,784.08 on the May 31, 2007 transfer from CWB to CWHL and to the unidentified (by Mr. Jenkins) third party described by Fendley as the HEQ pool is probative. Exhibit 1.00 p. 188 shows that the Toribios were obligated to make a first payment on May 15, 2007, thereby reducing the premium as indicated in Exhibit 13.03 from $44,000 to $43,784.08. If arguendo, Ms. Jenkins were correct, that Exhibit 13.03 showed the loan being reimbursed with money changing hands from CWB to CWHL, necessarily the full amount of the loan, $44,000, would be shown as being reimbursed as that was the amount actually loaned by CWHL to the Toribios and would be the reimbursable amount and the loan would not have then been transferred/sold by CWHL to CWHEQ, as reflected in the screen shot. It would have been CWB's loan to deal with not CWHL's to transfer, as occurred. Clearly, Ms. Jenkins is either misinformed or continues to demonstrate an alternate agenda in which CWB could be the lender in an "integrated transaction" necessitating reimbursement of CWHL of the money initially loaned to Toribio. Bank records or wire records that the Defendant suggests would demonstrate concretely that these amounts were not funded by CWB to CWHL have apparently been "purged" or not requested by Ms. Jenkins

11

despite their obvious importance.  Similarly, Ms. Jenkins in her several conversations with the Government never bothered to print the third screen of the series contained in Exhibit 13.02 which according to Mr. Fendley, that the final repository of the loan here as the CWHEQ investment pool.

CWHL funded the Toribio loan and was therefore the lender.  CWHL is not federally-insured.  The Government has failed to prove beyond a reasonable doubt that Michael O'Donnell violated the first clause of 18U.S. C. §1344 as he did not utilize a scheme or artifice with the intent to defraud a "Federal Institution", as defined.  Similarly, Mr. O'Donnell did not attempt to obtain "bank property" by means of a false statement or misrepresentation in violation of the second clause of 18 U.S.C. §1344 because as indicated, <u>supra</u>, as the only federally-insured entity herein – CWB – had not at any time material hereto funded the Toribio loan, no "Bank" property, than was involved in the loan and therefore any misrepresentations by the Defendant could not have resulted in obtaining "Bank" property that did not exist.  Any reasonable line-drawing policy analysis would indicate that no "Bank" (as in a federally-insured financial institution) was ever, or could have ever been at risk herein, and therefore no assertion of federal jurisdiction was proper.

That both CWB and CWHL were mentioned as lenders in conflicting documents is not ultimately determinative of anything.   One must not elevate form over substance, and should delve deeper to ascertain the reality of which entity actually put money into the loan and therefore assumed any risk of loss or harm.  Even Government witness Lanissa Jenkins, in one of her last responses during cross examination, reluctantly was forced to concede that CWHL was the entity that funded the subject loan and would have to be considered the "Lender".  We agree this is accurate if not obvious.  And, defense witness Neill Fendley's testimony supports

this conclusion as well.    Mr. Fendley's testimony also undermines Ms. Jenkins analysis above, that any <u>money</u> was ever subsequently transferred, or paid, by CWB to CWHL.

Parenthetically, had CWB actually done so, which they clearly did not, would still not be considered sufficient to create an "integrated transaction" which would essentially "grandfather" in federal jurisdiction, as there is utterly no evidence that the other pre-requisites to the integrated transaction model, as contained in 23A of the Federal Reserve Act as implicated by Regulation W.  with particular reference to the requirement of CWB's own personnel's evaluation of the trustworthiness of the loan and the credit trustworthiness of the borrower, which never occurred; the latter, a pre-condition for the federally-insured entity to attempt to use exemption 250.250 of the Federal Reserve Act which would have permitted CW B to purchase/acquire the subject loan from CWHL an affiliate company while not having to satisfy the rigorous standards of Section 23A.  As that did not happen as Sectionb 23A applies and no "integrated transaction" could have occurred here even given a CWB transfer of money to CWHL.    Parenthetically, as Countrywide Financial in March of 2007 became subject to the reqirements of the Office of Thrift Supervision, their regulations/rules were also not satisfied by CWB.

Finally, again that there are some documents which, without any substantive participation by CWB its employees, its use of its CWB rules, use of CWB's forms, use of its protocols, use of its underwriters making independent (from CWHL) pre-loan evaluations as to the credit-worthiness of the loan and borrower, and never ultimately funding the loan, do not even come close to satisfying the rigorous requirements  for the establishment of the an "integrated transaction" which could have allowed the federally-insured entity CWB to purchase/acquire the loan from its affiliate CWHL.

13

With respect, and in retrospect, what occurred is far more akin to what Countrywide Financial Corp. the parent company of CWB and CWHL and as well as many other subsidiaries, attempting to yet one more time ignore boundaries, ignore rules and regulations, and basically to try to unlawfully use the CWB Bank in name only without using CWB money to bolster the CWHL name after the multiple federal, state, and private lawsuits against CWHL in connection with the sub-prime mortgage meltdown to once again improperly maximize CWF profits while minimizing the risk to CWB, a prime asset of CWF, without risking the federally-insured status of CWB. [5]

---

There being no federally-insured institution involved in the Toribio loan, no federal funds put at risk, and no proper assertion of federal jurisdiction, Michael O'Donnell should be adjudged to be not-guilty of the indictment.

---

[5] Arguably CWF wanted to maintain for as long as it could its profitable intake of new mortgages, particularly the type sub-prime second mortgages and HELOCS that historically would go through CWHL to the secondary securities backed mortgage market, using CWB's still good name enhanced that possibility but CWB could not use CWB's money without risking CWB's federally-insured status. The CWF simply ignored the rules that made it inconvenient if not impossible to accomplish their goals. Thus, they never used CWB's money, resources, and people as would have been required under applicable federal regulations.

14

Date: July 20, 2015            Respectfully submitted,

                               MICHAEL P. O'DONNELL
                               By and through his attorney,

                               */s/ Jeffrey A. Denner*
                               Jeffrey A. Denner, BBO#120520
                               Joseph Keller, BBO# 686689
                               Jeffrey Denner Associates, PC.
                               Four Longfellow Place, 35th Floor
                               Boston, MA 02114
                               Tel.   (617) 227-2800
                               Fax    (617) 973-1562
                               jdenner@dennerlaw.com


### Certificate of Service

I, Jeffrey A. Denner, hereby certify that on this the 24th day of July 2014, I caused a true copy of the foregoing *Defendant's Post-Evidence Memorandum* to be served upon all necessary parties by virtue of electronically filing the same via the CM/ECF system.

                                /s/ *Jeffrey A. Denner*

                                Jeffrey A. Denner