UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Crim. No. 13-10262-DPW |
| | ) | |
| MICHAEL P. O'DONNELL, | ) | |
| Defendant | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S 28 U.S.C. §2255 MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE**

The United States of America submits this Memorandum to address the claims raised by defendant Michael O'Donnell ("O'Donnell") in his Motion to Vacate, Set Aside or Correct Sentence ("Petition") (D. 173). For the reasons set forth below, the Court should deny the relief requested without a hearing.

**BACKGROUND**

**Indictment, Representation, and O'Donnell's Defense Strategy**

O'Donnell was indicted in September 2013 and charged with one count of bank fraud in violation of 18 U.S.C. §1344, as part of a multi-year mortgage fraud scheme. D. 1. Count 1 charged that O'Donnell engaged in a scheme to defraud Countrywide Bank, FSB, a federally-insured financial institution, in connection with a $44,000 mortgage loan to borrower L.T. *Id*.

Attorney Jeffrey Denner ("Denner"), who had been representing O'Donnell since 2009, entered his appearance at the arraignment. Denner Aff., attached as Exhibit 1, at ¶2; D.11-12. Denner is an experienced criminal defense attorney in practice since 1973. Denner Aff. ¶1. Attorney Joseph Keller ("Keller"), Denner's co-counsel, has represented O'Donnell since 2014,

and entered his appearance on February 11, 2015.  D. 80.  Keller has been practicing since 2013.  Keller Aff., attached as Exhibit 2, at ¶1.

Denner and Keller had lengthy conversations with O'Donnell concerning the Indictment, the bank fraud statute, the government's evidence, and O'Donnell's potential defenses.  Denner Aff. ¶4; Keller Aff. ¶4.  O'Donnell was actively involved in virtually every aspect of his defense, including entering a trial stipulation, waiving his right to a jury trial, and not testifying at trial.  Denner Aff. ¶5; Keller Aff. ¶5.  O'Donnell kept notebooks on criminal law which he brought with him to meetings with defense counsel.  Denner Aff. ¶14.  He also did legal research on his own, and identified caselaw that was relevant to his case.  *Id*.[1]

Defense counsel believed that the government's case was strong, and that O'Donnell would likely be convicted at trial.  Denner Aff. ¶6.  They discussed with O'Donnell the option of a plea deal, but O'Donnell rejected that and directed counsel to prepare for trial.  *Id*.

Defense counsel had many discussions with O'Donnell about how best to defend the case at trial.  *Id*. ¶7.  They believed that the government would be unable to establish that Countrywide Bank—a "financial institution" within the scope of 18 U.S.C. §1344—rather than Countrywide Home Loans ("CHL")—which was not—had funded the L.T. loan.  *Id*.  They believed that focusing on that aspect of the case was O'Donnell's strongest chance for acquittal.  *Id*. ¶7-8.

Consistent with that strategy, defense counsel filed a motion to dismiss the Indictment, in which they argued that "the entity O'Donnell actually interacted with and received the loan from [was] Countrywide Home Loans," which was not a "financial institution" within the scope of the

---

[1] *See* O'Donnell's email stating that "I am most likely not correct but don't want to lose on a techincality (sic) of admitting to 1344(1) while we are trying to prevail on 1344(2)." Exhibit 1 to Keller Aff.

bank fraud statute, rather than Countrywide Bank, which was FDIC-insured. D. 47 at 2-3. O'Donnell's Trial Brief asserted that he would be calling Neill Fendly ("Fendly") to testify that O'Donnell secured the L.T. loan from CHL, rather than Countrywide Bank. D. 73 at 2. O'Donnell's Proposed Jury Instructions requested that the Court instruct the jury that "[f]or you to find the defendant guilty, you must find that he knowingly entered into a scheme to defraud Countrywide Bank. If you find that Countrywide Bank was not the lender in this case, you must find the defendant not guilty." D. 75 at 19.[2] In a motion to continue the trial, O'Donnell asserted that he needed time to investigate newly-disclosed evidence that he asserted could "substantially undermine[] the essence of O'Donnell's *long-formulated and openly articulated defense* which centers on the lack of the Federal nexus – a required element of the crime charged." D. 100 at 1-2 (emphasis added). In his motion for a nonjury trial, O'Donnell identified the issue to be litigated at trial as "the federal nexus required under 18 U.S.C. §1344." D. 115. In O'Donnell's Post-Evidence Memorandum, defense counsel argued that the government failed to prove either that Countrywide Bank had funded the L.T. loan, or that the Bank was involved as part of an integrated transaction. D. 126. In his closing argument at trial, Denner argued the same, and also that the evidence was insufficient to conclude that O'Donnell had received or read the two documents which advised that the L.T. loan application had been submitted to Countrywide Bank. July 21, 2015 Tr. at 42-64. (D.137).

---

2 Defense counsel is "relatively certain" that O'Donnell reviewed the trial pleadings prior to trial because O'Donnell "was involved in every aspect of the case, and some of them—such as the trial brief and proposed jury instructions—were filed months before the case actually went to trial." Keller Aff. ¶5; *see also* April 8, 2015 email from O'Donnell to Keller stating that he had "an issue with the wording" of a proposed stipulation concerning authenticity of some checks, attached as Exhibit 2 to Keller Aff. ¶8 (non-relevant pages of the email chain have been deleted).

Defense counsel and O'Donnell also discussed how they might minimize the "significant risk" that the government might elicit such damaging testimony from its witnesses about O'Donnell's involvement in the mortgage fraud scheme, that the jury "might be unwilling to acquit him on what they would most probably consider a 'technicality;' i.e., because the lender was Countrywide Home Loans rather than Countrywide Bank." Denner Aff. ¶8. Together, they decided that there was a better chance of an acquittal if the case was tried jury-waived, with much of the government's evidence presented in the "sanitized form" of a stipulation to facts that they knew—based on the discovery materials—that the government would be able to establish through its witnesses and exhibits." *Id*. ¶9; Keller Aff. ¶6. Based on their lengthy discussions with O'Donnell, counsel believed that he understood the reasons for doing so and that it gave him the possibility of prevailing at trial, and that he agreed with them. Keller Aff. ¶6.

After deciding on that strategy, defense counsel sought and obtained the government's consent to proceed jury-waived, and engaged in discussions concerning a stipulation. Denner Aff. ¶10. Defense counsel discussed with O'Donnell the terms of the stipulation, and he offered substantive comments and suggestions concerning its contents. Denner Aff. ¶10; Keller Aff. ¶7 and Exhibit 1 thereto. Defense counsel believed that the evidence contained in the stipulation would have been readily provable by the government at trial. Denner Aff. ¶¶ 8, 11; Keller Aff. ¶9. However, presenting it in the form of a stipulation avoided the substantial risk that other damaging testimony might be elicited from the government's witnesses. *Id*.

The stipulation did not contain an admission of all the elements of attempted bank fraud, nor did counsel believe that it guaranteed O'Donnell would be convicted, or that it amounted to a guilty plea. Denner Aff. ¶12. The stipulation specifically did not admit that O'Donnell knew

that Countrywide Bank was involved in the transaction or that the application had been submitted to Countrywide Bank, nor that O'Donnell intended to defraud Countrywide Bank. *Id*.

Although defense counsel knew that "attempt" was part of the bank fraud statute, they did not specifically discuss it with O'Donnell prior to trial. Denner Aff. ¶15; Keller Aff. ¶10. Even in hindsight, however, defense counsel do not believe that a greater focus on the case of attempted bank fraud would have changed the strategy of proceeding jury-waived and with a detailed stipulation of facts, nor the decision that O'Donnell not testify at trial. *Id*. Denner continues to believe that the conviction for the "attempt" was not legally sustainable. Denner Aff. ¶15.

**<u>Jury Trial Waiver and Stipulation</u>**

Prior to trial, O'Donnell moved to proceed jury-waived. D. 115. His motion stated that the parties had reached agreement on "a stipulation of certain facts that would narrow the issues in conflict in this trial," leaving the remaining issue of the "federal nexus." *Id*.

On July 10, 2015, the Court held a hearing and questioned O'Donnell on his decision to waive his right to a jury trial. D. 118, 141. On three separate occasions during the hearing, O'Donnell confirmed that he had had an adequate opportunity to discuss the case with Denner, and was satisfied that he had received the kind of legal advice he needed to make his own decision on whether or not to waive his right to a jury trial. *Id*. at 11, 12, 16. The Court explained, and made sure that O'Donnell understood, that choosing to proceed jury waived is an unusual and rare choice for a defendant to make, and that it involves "as subtle and difficult a strategic judgment as a defendant can make." *Id*. After explaining more about the right that O'Donnell was giving up, and some of the potential consequences of doing so, the Court asked O'Donnell why he wanted to proceed jury-waived. *Id*. at 12-15. O'Donnell replied that "I

5

believe that you are in the best position to understand the documents and what happened here." *Id*. at 15. Pressed further, O'Donnell stated that "I believe it's a very technical issue that needs to be explained in detail, and I'm afraid that a jury with lack of experience in that specific nature will have a difficult time understanding the actual facts." *Id*. at 15-16.

The Court then moved to consideration of the stipulation. It advised O'Donnell that if the Court accepted the stipulation, the facts contained in it "are proved" and O'Donnell does not get to dispute them. *Id*. at 16. O'Donnell confirmed that he had discussed the proposed stipulation fully with his attorneys. *Id*. The Court explained to O'Donnell that it was going to read the stipulation to him, and ask whether or not he agreed to it. *Id*. at 17.

The Court read the stipulation aloud. When it reached a reference to "bogus bank account statements" provided by O'Donnell, it asked O'Donnell if he was agreeing that he provided bogus account statements as found in Exhibit 2.13, and he replied "Yes." *Id*. at 19. The Court completed reading the stipulation aloud without further interruption. *Id*. at 19-23. Then Court then asked O'Donnell if he agreed "to all of that." *Id*. at 23. After conferring with Denner, O'Donnell replied "Yes, your Honor." *Id*. at 23-24. The Court again asked whether O'Donnell understood that the facts as contained in the stipulation were then "established beyond a reasonable doubt" and were going to be "part of the determination that I make in this case," to which O'Donnell responded "I do." *Id*. at 24.

After the stipulation was signed, the Court confirmed with Denner that he had fully discussed with O'Donnell the advantages and disadvantages of proceeding jury-waived, and had no doubt about O'Donnell's ability to knowingly and voluntarily waive his right to a jury trial. *Id*. at 25. The Court confirmed with both O'Donnell and counsel for the government they neither had any reason to believe that O'Donnell might not be competent to waive his right to a

jury trial, or that such waiver was not knowing and voluntarily. *Id*. With that, the Court found that it was satisfied that O'Donnell had knowingly, voluntarily, and intelligently waived the right to a jury trial, and approved the waiver. *Id*. at 25-26.

**Trial**

The trial began on July 15, 2015. Denner made an opening statement, in which he contended that there was no scheme to defraud a federally-insured financial institution and that no such institution was in fact defrauded. 7/15/2015 Tr. at 12-13 (D. 135).

The government's first of two witnesses was Reade Morrison ("Morrison"), a former CHL underwriter. *Id*. at 13-15. Morrison described the CHL application and underwriting process, and identified the condition sheet (hereafter, "approval letter") that was routinely sent to the mortgage broker—O'Donnell in this case—advising the broker of additional information that was needed before closing. *Id*. at 18-29. The approval letter ended with the words "Thank you for submitting your loan to Countrywide Bank, F.S.B." *Id*. at 27. Morrison also identified the fax cover sheet and attached documents O'Donnell had sent to CHL in response. *Id*. at 29. Finally, Morrison identified the final "clear to close" document—a second approval letter—that was routinely sent to the broker to let him or her know that all of the underwriting conditions had been met. *Id*. at 29-30. Denner vigorously cross-examined Morrison, focusing on his employment by CHL, not Countrywide Bank, during all of his interactions with O'Donnell. *Id*. at 35-54; Denner Aff. ¶13.

Lanisa Jenkins testified next that the source of the funds for the L.T loan was Countrywide Bank. *Id*. at 59-98. Denner's cross-examination of Jenkins "convinced the Court that the government had failed to prove that Countrywide Bank had funded the charged loan, either before or after the closing." Denner Aff. ¶13.

At the close of the government's case, Fendly testified for the defense.   July 16, 2015 Tr. at 4. (D. 136).   Fendly, a purported expert in the lending business, testified about the difference between CHL and Countrywide Bank, and gave opinion that Countrywide Bank had no involvement in the L.T. loan transaction.   Fendly was brought to the defense team by O'Donnell (Denner Aff. ¶5), and his testimony supported O'Donnell's defense theory.   The defense rested its case without calling O'Donnell to testify.   Tr. at 52.

**<u>O'Donnell's Decision Not to Testify</u>**

According to defense counsel, they had many conversations with O'Donnell before and during trial concerning his testifying at trial, and they decided together that O'Donnell would not do so.   Denner Aff. ¶16; Keller Aff. ¶11.   Counsel's actions were mostly consistent with that decision.   For example, defendant's trial brief focused exclusively on the expected testimony of Fendly, with no mention of O'Donnell testifying.   D. 73 at 2.[3]   Denner also submitted a proposed jury instruction that advised the jury that O'Donnell had not testified and that decision could not be used against him.   Denner Aff. ¶16; D. 75 at 17-18.   Defense counsel believe that O'Donnell reviewed all of the trial pleadings before they were filed.   Denner Aff. ¶16; Keller Aff. ¶5.

During the hearing on the jury trial waiver, Denner informed the Court in O'Donnell's presence that the defense intended to present "somewhere between zero and two witnesses, probably one witness," and identified that witness as Fendly.   7/10/2015 Tr. at 8.   Towards the end of that hearing, Denner reiterated that "[w]e would be calling Neill Fendly, and we may or may not be calling the defendant."   *Id*. at 27.   In his opening statement at trial, Denner did not

---

3 O'Donnell was identified as a possible witness in defendant's later-filed witness list. D. 97.

mention O'Donnell's testimony, which he would have done had it been likely that O'Donnell was going to testify. Denner Aff. ¶16. Nor did Denner prepare O'Donnell to testify, which he would have done had they decided he was going to do so, or even if O'Donnell had insisted on testifying against Denner's advice, which he did not. *Id*. According to Denner, he has never unilaterally decided that a defendant would or would not testify in his own defense, and he would have prepared O'Donnell and put him on the stand had he insisted on doing so against Denner's advice. *Id*. ¶17-18.

The Court found O'Donnell guilty of attempted bank fraud. D. 128, 137. Prior to sentencing, O'Donnell retained new counsel, attorneys James L. Sultan ("Sultan") and Charles W. Rankin ("Rankin"). D. 131, 144. They also represented O'Donnell on appeal of his conviction, raising as the sole issue the sufficiency of the evidence at trial of O'Donnell's intent to defraud Countrywide or his knowledge of Countrywide's involvement in the loan application process. *United States v. O'Donnell*, 840 F.3d 15 (1st Cir. 2016).

### **O'Donnell's §2255 Petition**

O'Donnell's Petition asserts that he was deprived of effective assistance of trial counsel when Denner: 1) "[e]ntered into a trial stipulation that effectively admitted his guilt and guaranteed his conviction;" and 2) made a "unilateral decision not to have the defendant testify." In support, O'Donnell asserts in his affidavit that Denner did not adequately explain to him the elements of the bank fraud statute or the consequences of agreeing to the trial stipulation. Aff. ¶6. He claims that had Denner done so, he would not have agreed to either the stipulation or the jury waiver. *Id*. ¶7. O'Donnell also avers that he and Denner had agreed prior to trial that O'Donnell would testify in his own defense, but that Denner made a "unilateral" decision

at trial not to call O'Donnell to testify. *Id*. ¶9. O'Donnell provides no corroboration, either in the record or otherwise, for his allegations.

As for appellate counsel, the Petition asserts that O'Donnell was deprived of the effective assistance of appellate counsel when Rankin failed to raise either of those same issues on appeal. O'Donnell offers no support for these allegations, either in his affidavit or otherwise.

### Ineffective Assistance of Counsel

#### The Legal Standard

A defendant seeking post-conviction relief on the basis of ineffective assistance of counsel must show: (1) that his "counsel's representation fell below an objective standard of reasonableness[;]" and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The petitioner bears the burden of establishing the need for relief under Section 2255. *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998).

"Under the first prong of *Strickland*, there is a 'strong presumption' that counsel's strategy and tactics fall 'within the range of reasonable professional assistance,' and courts should avoid second-guessing counsel's performance with the use of hindsight." *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) (quoting *Strickland*, 466 U.S. at 689); *see also Bucci v. United States*, 662 F.3d 18, 30 (1st Cir. 2011). To that end, "[i]t is only where, given the facts known at the time, counsel's 'choice was so patently unreasonable that no competent attorney would have made it,' that the ineffective assistance prong is satisfied." *Knight*, 447 F.3d at 15. "Indeed, while criminal defendants are entitled to competent representation, the constitution 'does not insure that defense counsel will recognize and raise every conceivable constitutional claim.'" *Bucci*, 662 F.3d at 31 (*quoting Engle v. Isaac*, 456 U.S. 107, 133-34 (1982). A defendant may not satisfy

the first part of the test simply by identifying potential, or even actual errors by counsel. Rather, he must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "The benchmark for determining whether a trial lawyer's performance has been constitutionally deficient is whether 'counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir. 1991), quoting *Strickland*, 466 U.S. at 686. "The Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." *United States v. Natanel*, 938 F.2d at 309-10.

Under the second, prejudice, prong, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. "[T]his is a 'highly demanding' and 'heavy burden.'" *Knight*, 447 F.3d at 15 (internal citation omitted). Moreover, "[a] defendant's failure to satisfy one prong of the *Strickland* analysis obviates the need for a court to consider the remaining prong." *Tevlin v. Spencer*, 621 F.3d 59, 66 (1st Cir. 2010). In other words, if a defendant cannot establish "prejudice," a court need not even inquire into the attorney's conduct.

"Evidentiary hearings on §2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted." *Moreno–Morales v. United States*, 334 F.3d 140, 145 (1st Cir. 2003). In light of this high bar, evidentiary hearings are rare in Section 2255 actions. "In most situations, motions can be 'heard' effectively on the papers, with the parties submitting evidentiary proffers by means of affidavits, documentary exhibits, and the like." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993). Moreover, when such motions are presented to the trial judge, "the judge is at liberty

11

to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." *Id*. A hearing is unnecessary "when a §2255 motion is conclusively refuted as to the alleged facts by the files and records of the case." *Id*. at 225-26. In short, Section 2255 petitions maybe denied without a hearing if the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or if the allegations need not be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact. *Id*. at 226.

## ARGUMENT

### The Trial Stipulation

O'Donnell argues that Denner was constitutionally ineffective because he advised O'Donnell to agree to a stipulation that "effectively admitted his guilt" to attempted bank fraud, and "guarantee[d] his conviction." Memo at 8-10. He further claims, albeit with little elaboration, that but for counsel's poor advice on this issue, he would not have agreed to the stipulation, but instead would have insisted on a jury trial.[4] O'Donnell fails to meet his burden for several reasons.

First, his assertion is factually incorrect, as the stipulation plainly does not admit that he knew Countrywide Bank was involved in the L.T. transaction, nor that he intended to defraud

---

4 Neither O'Donnell's Petition nor his supporting Memorandum asserts that Denner was ineffective in advising O'Donnell to proceed jury-waived. However, in his affidavit, O'Donnell asserts that had he "been properly advised, [he] would not have agreed either to the stipulation or the jury waiver, as they amounted to a guilty plea." O'Donnell Aff. ¶ 7. Since he has failed to develop this argument at all, it should be deemed waived. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). In any event, as discussed above, the decision to proceed jury-waived was part of a well-considered strategy agreed to by O'Donnell, and defense counsel were not ineffective in advising him to follow that strategy.

12

Countrywide Bank.[5] O'Donnell's defense from the beginning of the case through his appeal was that he lacked such knowledge and intent. O'Donnell points to nothing in the stipulation that admits either of those facts. Moreover, the issues of his knowledge and intent were the issues actually litigated at trial, not just by use of the stipulation, but through witnesses and exhibits.

Second, O'Donnell's decision to stipulate and proceed jury-waived was part of a strategy to stipulate to facts that were otherwise readily provable by the government, in order to focus on a defense perceived to have the greatest likelihood of success, and avoid the risk of more damaging testimony introduced through the government's witnesses. Such a strategy, while not ultimately successful, did not fall outside "the range of reasonable professional assistance." *Knight v. Spencer*, 447 F.3d at 15; *see*, *e.g.*, *United States v. Downs-Moses*, 329 F.3d 253, 265 (1st Cir. 2003) (defendant failed to establish the first prong of *Strickland* based on his attorney's agreement to stipulate at trial to the quantity of cocaine, because that "reasonable tactical decision" "spared the defendant the spectacle of twenty-eight bales of cocaine on parade before the jury."); *United States v. Simone*, 931 F.2d 1186, 1197 (7th Cir. 1991) (concluding that stipulation of facts and charges for which there was "unrefutable evidence and no mandatory sentences," while "forcefully" arguing innocence on charges with heavier penalties was part of a "reasonable plan that was evident from the beginning of the trial," to which defendant not only raised no objection, but instead chose or at least condoned the tactics); *Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985) (rejecting argument that stipulation was the functional equivalent of a guilty plea, where the stipulation did not admit the essential element of specific intent, and also

---

5 O'Donnell claims in his affidavit that the Court "expressed surprise" during a discussion of the stipulation that O'Donnell was admitting to attempted bank fraud. O'Donnell Aff. ¶6. O'Donnell fails to identify where in the record this took place, and it is not reflected in the transcript.

rejecting ineffective assistance claim where defendant failed to identify any prejudice resulting from the stipulation);

Denner and Keller's affidavits establish that the stipulation and jury waiver were part of their strategy to minimize risk to O'Donnell of a more fulsome presentation of damaging evidence, while focusing on the more technical defense which they perceived would have the greatest likelihood of an acquittal. *See*, *e.g.*, *United States v. Lyons*, 898 F.2d 210, 214-15, n. 5 (1st Cir. 1990) (noting that reasons a defendant may proceed to trial by stipulation include controlling the evidence of his actions to "limit the judge's exposure to aggravating circumstances which may be developed more vividly during live testimony at a full trial.").

The Court's extensive colloquy with O'Donnell established that O'Donnell understood that defense, and knowingly and voluntarily decided to both waive a jury trial and agree to the stipulation as a means of furthering that defense. *Bonilla-Romero v. United States*, 933 F.2d 86, 89 (1st Cir. 1991) (affirming finding that defendant's jury trial waiver and stipulations were voluntary, where stipulation was part of a trial strategy, and the court's questioning of defendant established that he was "well-informed and was making the decision freely.").

Finally, even if the Court were to find that Denner's advice concerning the stipulation was constitutionally ineffective, O'Donnell has failed to establish *Strickland* prejudice, and so his claim must be rejected. O'Donnell asserts, without any corroboration, that had he been "properly advised," he would not have agreed to either the stipulation or the jury waiver, but instead would have pursued "a viable defense to the charges." O'Donnell Aff. ¶7. He asserts that there was "evidence that I was not aware that I was dealing with Countrywide Bank rather than Countrywide Home Loans." *Id*. O'Donnell does not identify what that evidence, which alone is fatal to his claim.

In any event, the defense that O'Donnell was not aware that he was dealing with Countrywide Bank is exactly the defense his attorneys pursued at trial. They elicited evidence in support of that defense through the cross-examination of Morrison and Jenkins, and the direct testimony of Fendly, and Denner argued the defense strenuously in his closing.

O'Donnell has suggested no scenario in which the government would have been unable to present its evidence, outlined in its Trial Brief (D.69), to establish all of the elements necessary to convict O'Donnell's of the charged bank fraud scheme. Nor does O'Donnell indicate how he might have prevented the admission of evidence that he received the two approval letters with the language advising him the loan had been submitted to Countrywide Bank, or that he responded to the first such letter with materially false documents and information. Separate and apart from the stipulation, Morrison's testimony established that O'Donnell had received and responded to those letters. See July 16, 2015 Tr. at 51 (The Court, in rejecting defendant's arguments that there was no evidence that he had received the two documents, noted that, "apart from received being shown by response, it is in the ordinary course this was what was sent out," a clear reference to Morrison's testimony). *See United States v. Fuller*, 768 F.2d 343, 347 (1st Cir. 1985) (rejecting ineffective assistance of counsel claim concerning decision to stipulate to defendant's prior conviction and that firearm had been shipped in interstate commerce, leaving only one element of the crime to be proved; noting that while it was true that the stipulations saved the government "some leg-work by lightening its burden of producing evidence on every element of the offense . . . the defendant failed to even suggest "that these two factors were not readily provable simply by reference to public records and the like.").

Both Denner and Keller assert that they would have pursued the same trial strategy of proceeding jury-waived and entering the stipulation, even if they had focused more closely on the

15

attempted bank fraud case. Denner Aff. ¶15; Keller Aff. ¶10. Although O'Donnell asserts he would not have agreed to either, he offers no alternative strategy that would establish a reasonable probability of a different result at trial.

**O'Donnell's Decision to Not Testify at Trial**

O'Donnell claims, with no corroboration, that by not putting him on the stand at trial, Denner co-opted a joint decision that had been made that O'Donnell would testify. O'Donnell argues that, because the stipulation proved that he had engaged in a mortgage fraud scheme, his only means of establishing his lack of knowledge and intent with respect to Countrywide Bank, was to testify to that lack of knowledge and intent. O'Donnell's uncorroborated assertion that he and counsel had jointly agreed that he would testify is directly contradicted by the affidavits of both Denner and Keller, and is inconsistent with the proceedings in this case, as discussed above. Furthermore, the testimony O'Donnell asserts he would have given is internally inconsistent, and his credibility would not have withstood cross-examination. Thus, even if he had testified, there is no reasonable probability that he would have been acquitted.

Of course, "[a] criminal defendant has a constitutional right to testify in his own defense." *Rosenthal v. O'Brien*, 713 F.3d 676, 687 (1st Cir. 2013). "Counsel, acting alone, cannot waive this right on behalf of the defendant." *Id*. "Moreover, silence alone does not imply a waiver; there must be something in the record suggesting a knowing waiver." *Id*. However, "[u]naccompanied by coercion, legal advice concerning exercise of the right to testify infringes no right." *Lema v. United States*, 987 F.2d 48, 52 (1st Cir. 1993).

The affidavits of Denner and Keller, which assert that the decision not to call O'Donnell to testify was one made jointly with O'Donnell, is consistent with the trial pleadings they filed and which O'Donnell read. It is consistent with statements Denner made in open court during

16

the jury-waiver hearing about the witnesses he was likely to call, which did not include O'Donnell. It is consistent with Denner not referencing O'Donnell's testimony in his opening statement, and his failure to prepare O'Donnell to testify, both of which he would have done had he considered that O'Donnell was going to testify. See, e.g., *McCann v. United States*, 528 F.Supp. 2d. 4, 6-7 (D. Mass. 2008) (Posner, J.) (defense counsel made no effort to prepare defendant to take the stand because they had agreed his interests would be better served by not testifying; to then have him testify with no preparation "might itself have constituted ineffective assistance of counsel.").

On the other hand, O'Donnell's assertion that Denner prevented him from testifying is entirely self-serving and unsupported by anything in the record. See e.g., *Siciliano v. Vose*, 834 F.2d 29, 30 (1st Cir. 1987) (rejecting claim that defendant's attorney prevented him from testifying where defendant's affidavit merely alleged "in conclusory fashion, that his attorney refused to allow him to 'testify in [his] own behalf'").

Even if Denner had prevented O'Donnell from testifying, O'Donnell has failed to establish how, but for his not testifying, there is a reasonable probability that he would have been acquitted. Not only is O'Donnell's proffered testimony internally inconsistent, he fails to establish why his testimony would be believed by the fact-finder after his credibility was effectively attacked on cross-examination. See, e.g., *Smith v. Kickhaut*, 836 F.3d 97, 106-107 (1st Cir. 2016) (defendant failed to show that, had he testified, there is a reasonable probability that the outcome of the trial would have been different, noting that trial court had concluded his proposed version of events "was simply not credible;" noting also that defendant would have exposed himself to potential cross-examination and impeachment concerning his criminal activities and his prior inconsistent statements).

O'Donnell asserts that he would have testified at trial that he had closed hundreds of loans with Countrywide Home Loans from 1998 through the charged loan in 2007, and that the approval letters on "every one of those loans" stated "Thank you for submitting your loan to Countrywide Home Loans." O'Donnell Aff. ¶9. Logically, he could only testify to that if he had, in fact, read the entire "thank you" line on each one. But he then claims that he "never read the approval language" on the L.T. loan." *Id.* In other words, he would want the Court or a jury to believe that he had read that line on every one of hundreds of approval letters he had received over the course of nearly a decade, but, for some unexplained reason, he did not read the line on just the two approval letters for the L.T. loan. In short, O'Donnell's testimony would have consisted of implausible, uncorroborated, and self-serving statements about not reading one line in two approval letters that he admitted having read consistently in hundreds of previous instances. "[T]aking the stand to spin such a fanciful yarn would not . . . have created a reasonable probability that the jury would buy it." *Rossetti v. United States*, 773 F.3d 322, 328 (1st Cir. 2014).

By testifying, O'Donnell would have been subject to being cross-examined about not only the damning facts contained in the stipulation, but also the many false and fraudulent loan applications and documents he had submitted to lenders during the course of his mortgage fraud scheme. See details in Government's Sentencing Memorandum at pg. 8-12 (D. 146). *Rossetti v. United States*, 773 F.3d at 328 (by testifying, defendant would have opened himself up to cross-examination about every detail of his participation in the charged crime.). He would have also been confronted with his destruction of his computer hard-drive to obstruct the government's mortgage fraud investigation of him and others. Sentencing Memo at 14. A judge or jury

18

might infer from that conduct that he had destroyed it because it contained evidence of his direct dealings with Countrywide Bank.

In short, the government would have established that O'Donnell was willing to lie and fabricate documents repeatedly to line his own pockets, and to destroy evidence to avoid being prosecuted. Any factfinder would therefore conclude that O'Donnell would also lie under oath to try to avoid a conviction, and disregard his uncorroborated and inconsistent testimony.

In any event, he has failed to establish that had he testified at trial, there is a reasonable probability that he would have been acquitted.

### **Decision to not Raise Ineffective Assistance of Trial Counsel on Appeal**

O'Donnell asserts that appellate counsel were ineffective for failing to raise the two issues of ineffective assistance in his direct appeal. O'Donnell's Memorandum barely addresses their representation, and fails to elaborate on how it was ineffective. For that reason alone, the claim of ineffectiveness by appellate counsel should be denied without a hearing. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (claims that are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, [should be] deemed waived").

In any event, it should be rejected for the reasons stated in the Response submitted by Rankin and Sultan. D. 179. As they note, absent extraordinary circumstances, claims of ineffective assistance of counsel should be raised in a §2255 petition, not on direct appeal. See, e.g., *Casiano-Jimenez v. United States*, 817 F.3d 816, 819 (1st Cir. 2016). O'Donnell fails to explain why this general rule does not apply in his case. Moreover, because such claims must be raised initially in the district court in a §2255, they are not waived when not raised on direct. Thus, O'Donnell suffered no prejudice from appellate counsels' decision.

## CONCLUSION

For all the reasons stated above, O'Donnell has failed to establish that his attorneys provided ineffective assistance of counsel under the *Strickland* standard, and O'Donnell's §2255 Petition should be denied without a hearing.

*Respectfully submitted*,

WILLIAM D. WEINREB
Acting United States Attorney

By: /s/ Mark J. Balthazard
MARK J. BALTHAZARD
Assistant U.S. Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Mark.balthazard@usdoj.gov
BBO #544463
(617) 748-3208

Date:   December 18, 2017

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).   There are no non-registered participants.

December 18, 2017                              /s/ Mark J. Balthazard
                                               MARK J. BALTHAZARD
                                               Assistant U.S. Attorney