# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 13-10262-DPW |
| | ) | |
| MICHAEL P. O'DONNELL, | ) | |
| Defendant | ) | |

### AFFIDAVIT

I, Jeffrey A. Denner, being duly sworn, state as follows:

### INTRODUCTION

1. I am an attorney licensed to practice law in the Commonwealth of Massachusetts. I have been a member of the bar since 1973. I am a graduate of Yale College and Harvard University Law School. I am a member of the Massachusetts Bar Association, Massachusetts Association of Criminal Defense Lawyers, and the National Association of Criminal Defense Lawyers.

2. I had represented Michael O'Donnell (herein after "O'Donnell") from 2009 until he hired appellate counsel.

3. I submit this affidavit in response to the allegations made by O'Donnell in connection with his §2255 Petition and supporting affidavit.

4. Both my associate Joseph Keller and I had lengthy conversations with O'Donnell concerning the allegations contained in the Indictment, the bank fraud statute, the government's evidence against O'Donnell, and his potential defenses.

5. O'Donnell was actively involved in virtually every aspect of his defense, including decisions about entering a trial stipulation, waiving his right to a jury trial, and not

testifying at trial. O'Donnell brought Neill Fendley, his expert trial witness, to the defense team.

6. Initially, I believed that the government had a sufficiently strong case against O'Donnell to merit very serious consideration of resolving the case by pre-trial negotiations, plea deal, and would likely prevail, all of which was thoroughly discussed with O'Donnell and which path he ultimately rejected and directed that we go to trial

7. Given the strength of the government's case concerning O'Donnell's involvement in an extensive mortgage fraud scheme, and after multiple discussions with O'Donnell, we made a strategic decision to focus the defense on whether or not the subject lending institution herein, was a financial institution as defined by 18 U.S.C. §1344 and relevant caselaw which we believe to be an essential condition precedent to the valid assertion of federal jurisdiction and, therefore, a necessary component for conviction.
O'Donnell and his legal counsel believed that they would be most likely unable to prove beyond a reasonable doubt that Countrywide Bank had funded the charged loan or was involved as part of an "integrated transaction." See *United States v. Edelkind*, 467 F.3d 791 (1st Cir. 2006). .

8. While we believed that focusing on the jurisdictional element was O'Donnell's strongest chance for an acquittal, we were concerned that a jury that heard substantial testimony about O'Donnell's lengthy involvement in the mortgage fraud scheme, might be unwilling to acquit him on what they would most probably consider a "technicality;" i.e., because the lender was Countrywide Home Loans rather than Countrywide Bank. In this regard, while I knew the basic evidence the government was likely to present, I saw a significant risk that other damaging testimony might be elicited from some of the

government's witnesses, including the elderly borrower and the disreputable accountant. I saw using a stipulation as an effective method of limiting those risks.

9. For these reasons, among others, O'Donnell and defense counsel together decided that he would have a better chance of acquittal if the case was tried jury-waived, and if we could stipulate to facts that we knew—based on the discovery we had received—that the government would be able to establish through its witnesses and exhibits.

10. After lengthy discussion with O'Donnell, we sought the government's assent to a jury-waived trial, and engaged in discussions concerning a stipulation. We discussed the terms of the stipulation with O'Donnell at length, and he provided substantive comments and suggestions concerning its contents.

11. Based on my review of the government's evidence, including reports of witness interviews, I believe that the evidence contained in the stipulation signed by O'Donnell would have been readily provable by the government through its witnesses and exhibits without the additional risks, above-noted.

12. I also do not believe that the stipulation was an admission by O'Donnell of all the elements of attempted bank fraud, nor do I agree that it guaranteed he would be convicted, or that it amounted to a guilty plea. As both O'Donnell and I informed the Court prior to trial, his defense was a narrower one, focused on whether Countrywide Bank was the intended lender on the charged loan. The stipulation did not admit that O'Donnell knew that Countrywide Bank was involved in the transaction or that the application had been submitted to Countrywide Bank, nor did it admit that O'Donnell intended to defraud Countrywide Bank. We strenuously disputed those matters at trial.

13. At trial, I vigorously cross-examined government witness Reade Morrison, and established through him that he was an employee of Countrywide Home Loans, not Countrywide Bank, and that all of O'Donnell's interactions with him were while he was so employed. I also vigorously cross-examined government witness Lanisa Jenkins, and even convinced the Court that the government had failed to prove that Countrywide Bank had funded the charged loan, either before or after the closing.

14. At all times during my representation of him, O'Donnell was actively involved in his own defense. He kept notebooks on criminal law which he brought with him to our meetings. He also did some of his own legal research, and brought appellate opinions to our attention that were relevant to his case.

15. While we were mindful that "attempt" is part of the bank fraud statute, we did not specifically discuss with O'Donnell the issue of "attempt" until the Court raised it with the government during closing argument. However, I do not believe that a greater focus on the case of attempted bank fraud would have altered our strategy going jury-waived and entering into the stipulation, nor would it have altered the decision that O'Donnell not testify. I did not then and do not now believe that the conviction for the "attempt" was legal sustainable.

16. As for the decision concerning O'Donnell testifying, I had multiple conversations with him before and during trial, and we both decided that he would not testify. Toward that end, I, before trial, included a proposed jury instruction which advised the jury that defendant had not testified and that it could not be used against him. I believe O'Donnell reviewed all of the trial pleadings before I filed them. In addition, I did not discuss O'Donnell's testimony in my opening, which I would have done if it were likely that he

would testify. I also never prepared him, which I certainly would have done had we decided he was going to testify, or if he had insisted upon doing so against my advice, which he did not.

17. In my several decades of defending criminal defendants, I have never unilaterally decided that a defendant would or would not testify in his or her own defense.

18. I would never not put a defendant on the stand who wanted to testify. Had O'Donnell indicated to me that he wanted to do so, I would have asked the Court for a colloquy, and put on the record that I advised against it. However, I still would have prepared him in advance to do so.

Sworn under the pains and penalties of perjury

_____
Jeffrey A. Denner