# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 13-10262-DPW |
| | ) | |
| MICHAEL P. O'DONNELL, | ) | |
| Defendant | ) | |

## **AFFIDAVIT**

I, Joseph Keller, being duly sworn, state as follows:

### **INTRODUCTION**

1. I am an attorney licensed to practice law in the Commonwealth of Massachusetts. I have been a member of the bar since 2013. I am a graduate of Colgate University (B.A. 1985), Tufts University (M.A. 1990) and Massachusetts School of Law (JD 2013). I am a member of the Massachusetts Bar Association.

2. I have represented defendant Michael O'Donnell ("O'Donnell") since 2014 in connection with the government's mortgage fraud investigation and prosecution.

3. I submit this affidavit in response to the allegations made by O'Donnell in his §2255 Petition and supporting affidavit.

4. Along with co-counsel Jeffrey Denner, I had lengthy conversations with O'Donnell concerning the allegations contained in the Indictment, the bank fraud statute, the government's evidence against O'Donnell, and his potential defenses.

5. O'Donnell was actively involved in virtually every aspect of his defense, including decisions about entering a trial stipulation, waiving his right to a jury trial, and not testifying at trial. O'Donnell was more involved in dictating strategy in his case than most of the

clients I have represented. Although I don't recall sending him copies of the trial pleadings, I am relatively certain he reviewed them at some point before trial, as he was involved in every aspect of the case, and some of them – such as the trial brief and proposed jury instructions- were filed months before the case actually went to trial.

6. I participated with Jeffrey Denner in discussing with O'Donnell his plea and trial options. O'Donnell was actively involved in the strategy and decision to proceed jury-waived and with much of the government's evidence presented in a sanitized form by way of a written stipulation. Based on our lengthy discussions, I believe that O'Donnell understood the reasons for doing so and agreed with them. I believe that he agreed that doing so gave him the best possibility of prevailing at trial.

7. With respect to the stipulation, I forwarded to O'Donnell by email a copy of the government's draft, and advised him to read it carefully because I was not sure about the accuracy of a few things. Attached as Exhibit 1 is a copy of my email to O'Donnell and his response, along with a copy of the draft with his edits.

8. Also attached, as Exhibit 2, is an email from O'Donnell noting an issue with a proposed stipulation that referenced a "Countrywide Bank, FSB loan closing."

9. Based on my review of the government's evidence, including reports of witness interviews, I believe that the evidence contained in the stipulation signed by O'Donnell would have been readily proveable by the government through its witnesses and exhibits. As I noted above, it did so without including the negative aspects—to O'Donnell—of the Court actually hearing from some of those witnesses.

10. While we were mindful that "attempt" is part of the bank fraud statute, we did not specifically discuss with O'Donnell the issue of "attempt" until the Court raised it with the

2

government during closing argument.   However, I do not believe that a greater focus on the case of attempted bank fraud would have altered our strategy going jury-waived and entering into the stipulation, nor would it have altered the decision that O'Donnell not testify.

11. As for the decision concerning O'Donnell testifying, I participated with Jeffrey Denner in some of the many conversations with O'Donnell on that topic, and we all agreed that he would not testify.   Based on those decisions and discussions, we did not prepare O'Donnell to testify at trial, which we would have done had we agreed otherwise or if he had insisted on testifying.


Sworn under the pains and penalties of perjury.


Joseph Keller

3

# EXHIBIT 1

**Joseph Keller**

| | |
|---|---|
| **From:** | Michael O'Donnell <███████@gmail.com> |
| **Sent:** | Thursday, July 09, 2015 8:48 PM |
| **To:** | Joseph Keller |
| **Subject:** | Re: Stipulations |
| **Attachments:** | Trial Stip Edit.pdf; 1344.pdf; Loughrin Final.pdf; MOD Indict.pdf; Update Jury Instructions.pdf |

Joe

Attached is my edited version of the Trial Stips. You can decide if i'm just being picking or they are worth the effort.

As discussed earlier I am probably over concerned about the language in the 1st paragraph. The language in Not the same as the statute or the indictment.

I am most likely not correct but don't want to lose on a techincality of admitting to 1344(1) while we are trying to prevail on 1344(2)

Call if you needd me

Thanks
Mike O

On Thu, Jul 9, 2015 at 5:35 PM, Joseph Keller ████ @dennerlaw.com> wrote:

Mike,

This is a draft from the gov't.

Please review. I am not sure about the accuracy of a few things, so please read carefully.

Talk to you later.

Very truly yours,

1

JOE KELLER, ESQ.

J.A. Denner & Associates, P.C.

4 Longfellow Place, 35th Floor

Boston, MA 02114

Cel. (781)367-7142

Office (617-227-2800 ext. 216

Fax (617)973-1562

█████@dennerlaw.com

Disclosure: This message is intended exclusively for the individual to whom it is addressed, and may contain information that is proprietary, privileged, confidential and otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, disseminate or forward this message or any part of it. If you have received this message in error, please notify me by phone at (617)227-2800 ext. 216 or by email at jkeller@dennerlaw.com and delete all copies of the message. **Warning:** This email **does not** create an attorney-client relationship between the individual to whom this email is addressed and Joe Keller of J.A. Denner & Associates, P.C. An attorney-client relationship exists if you previously signed an attorney retainer agreement for legal services from Joe Keller, Esq. and J.A. Denner & Associates, P.C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )   Criminal Case No. 13-10262-DPW
           v.                     )
                                  )
MICHAEL P. O'DONNELL,             )
           Defendant.             )

## DEFENDANT'S TRIAL STIPULATION

The defendant Michael P. O'Donnell ("Defendant") stipulates and admits that he (1) engaged in a scheme or artifice to defraud or obtain money by means of materially false statements or misrepresentations; and (2) did so knowingly. He further stipulates and admits to all the allegations contained in the Indictment, except for the allegation that the lender charged in Count One was ~~Countrywide Bank~~, FSB. He further stipulates and admits to the following:

During the relevant times, O'Donnell was a self-employed loan originator operating through his mortgage loan originator business AMEX Home Mortgage Corporation, located in Middleton, Massachusetts. As a loan originator, O'Donnell completed mortgage loan applications based on information purportedly supplied by individuals seeking to obtain loans for the purchase or refinance of real estate, submitted these applications to mortgage companies, which then funded the loans, if approved. In or about October through April 2007, O'Donnell engaged in a scheme to defraud mortgage lenders in connection with the refinancing of a three-family dwelling located at 40 Harbor Street in Salem, Massachusetts ("the Harbor Street Property").

In 2005, L.T. purchased the Harbor Street Property and has lived in one of its units since that time. The deed was in the names of L.T. and M.A., her daughter. In late 2006, L.T. sought to refinance her mortgage to reduce her monthly payments. In or about February and March

2007, O'Donnell knowingly submitted a loan application containing material, false information about income, employment and assets on behalf of L.T. to Homecomings Financial Network, Inc. ("Homecomings"), located in New Jersey. In conjunction with the materially false representations in that application, O'Donnell: (1) provided bogus bank account statements [Exhibit 2.13], (2) provided bogus letters from tax preparer/accountant John Caruso (*a.k.a.* John Carter) falsely representing that Caruso had prepared L.T.'s tax returns [Exhibits 2.14, 2.15], and (3) arranged for Caruso to provide a fraudulent verbal verification of L.T.'s employment. The loan application package also falsely reflected that L.T. would pay over $31,000 of her own money as part of the refinancing, which was a material factor in Homecoming's risk analysis and decision to approve the loan.

L.T. would testify that she has a grade school education and does not speak or read English. She would testify that she never completed the Uniform Residential Loan Application dated October 19, 2006 for a $352,000 loan, which O'Donnell knowingly submitted to Homecomings. [Exhibit 2.05] L.T. would further testify that her signature on the loan application dated October 19, 2006 is a forgery, although the signature on the loan application dated March 7, 2007 [Exhibit 2.06] is hers.

Moreover, L.T. would testify that the employment, income and asset information in the loan applications are false. Specifically, she would testify that instead of earning over $10,000 per month as the falsified applications claimed, L.T., in reality, earned about $1,200 each month at that time. L.T. would also testify that she never had $50,000, or even nearly that much, on deposit in a bank account, and that she never provided any income or asset information to O'Donnell. A Bank of America record keeper would testify that the Bank of America account statements that O'Donnell submitted to Homecomings [Exhibit 2.13] (and Countrywide, as

2

explained below) were fabricated.

Further, L.T. would testify that she has never hired John Caruso to prepare her tax returns and does not know anyone by that name. ~~Caruso, in turn, would testify that he had an arrangement with O'Donnell going back several years in which O'Donnell engaged Caruso to provide false letters, tax documents and verbal verifications of employment to lenders on loans O'Donnell sought on behalf of his clients, and that O'Donnell paid Caruso for doing this. Caruso would testify that the arrangements included his use of the alias John Carter. Caruso knew that if a lender called his office asking to speak to John Carter, then the lender was referring to one of O'Donnell's loans, and Caruso provided the requested employment verification.~~ Finally, Caruso would testify that he never prepared tax returns or anything else for L.T. and did not know her. O'Donnell's relationship with Caruso would be corroborated by conversations O'Donnell had with a government cooperator, which were recorded.

Because L.T. in fact did not have over $31,000 to put towards the refinancing, O'Donnell paid the money using his AMEX Home Mortgage bank account. Based on the fraudulent representations in the loan application and the HUD-1 settlement statement, and the $37,392.16 that O'Donnell provided at closing, Homecomings funded a $352,000 loan, secured by the Harbor Street Property, to L.T. O'Donnell received $14,698 in various broker fees as a result of this loan, ~~which L.T. never approved.~~

To recoup the $37,392.16 that he had put into the first transaction, O'Donnell submitted an application on behalf of L.T. for a second mortgage loan in the amount of $44,000.00. O'Donnell submitted the application and other documentation to Countrywide, where Countrywide Home Loans employees underwrote and processed the loan application. In conjunction with this second loan application, O'Donnell knowingly submitted the same false

3

information and documentation as he had to Homecomings, *i.e.,*: (1) a loan application in which he falsely inflated L.T.'s income and assets, (2) bogus bank account statements, and (3) a bogus letter from Caruso falsely advising that he had prepared L.T.'s tax returns. ~~O'Donnell also arranged for Caruso to provide a fraudulent verbal verification of L.T.'s employment.~~

Regarding the documents submitted to Countrywide on her behalf, L.T. would testify that she never completed the Uniform Residential Loan Application dated October 19, 2006 for a $44,000 loan [Exhibit 1.07]. L.T. would further testify that her signature on the loan application dated October 19, 2006 is a forgery, although the signature on the loan application dated April 20, 2007 [Exhibit 1.06] is hers.

The Countrywide underwriter who approved L.T.'s loan would testify that approval of the loan was conditioned upon satisfactory completion of various conditions, including borrower-written explanations of previous credit inquiries and late credit line payments. Countrywide also requested, among other information, a letter from a certified public accountant stating that L.T. has been self-employed for two years. O'Donnell received the list of conditions from Countrywide on or about March 26, 2007. [Exhibit 1.12] O'Donnell, in turn, fabricated responses from L.T. to answer Countrywide's questions about credit inquiries and late credit line payments. He then, again, forged L.T.'s signature and forwarded these responses to Countrywide. [Exhibit 1.15] In response to Countrywide's request for a CPA letter, O'Donnell also included a copy of the bogus letter from Caruso, falsely advising that he had prepared L.T.'s tax returns and verifying that L.T. was supposedly self-employed at the time. L.T. would testify that she never created or signed the documents that O'Donnell provided to Countrywide [Exhibit 1.12], nor did she authorize O'Donnell to provide such information on her behalf to Countrywide.

4

The Countrywide underwriter who approved L.T.'s loan would testify that the false information concerning L.T.'s income, assets and employment were material to the decision to approve the loan. ~~Indeed, if he had known that such income, asset and employment information was not true, the loan would not have been approved~~. The $44,000 Countrywide loan closed on or about April 20, 2007, and O'Donnell received $37,392 directly from the proceeds by a check payable to AMEX Home Mortgage, along with an additional $1,198 in fees.

O'Donnell admits and stipulates to the admission in evidence against him of the documents marked as Exhibits 1 – 9, 11 and all subparts thereof. He further admits and stipulates to the admission in evidence against him of the contents of the Stipulations filed previously with the Court as Docket Numbers 86 – 93. Those Stipulations incorporate O'Donnell's agreement and stipulations to the authenticity of certain records and that they are "business records" as defined by FED. R. EVID. 803(6). The documents include the following:

1. The Countrywide Bank, FSB loan file for the refinancing of 40 Harbor Street, Salem, Massachusetts by L.T.;

2. The Homecomings Financial Network, Inc. loan file for the refinancing of 40 Harbor Street, Salem, Massachusetts by L.T.;

3. The Homecomings Financial Network, Inc. file relating to a cancelled loan application for the refinancing of 40 Harbor Street, Salem, Massachusetts by L.T.;

4. North Shore Bank account records for the AMEX Home Mortgage Corporation account;

5. McGonagle & McGonagle, P.C.'s disbursement checks for the Homecomings Financial Network, Inc., loan closing on March 7, 2007;

6. McGonagle & McGonagle, P.C.'s disbursement checks for the Countrywide Bank, FSB loan closing on April 20, 2007;

7. Public records concerning 40 Harbor Street, Salem, Massachusetts, recorded at the Essex County Registry of Deeds; and

8. Public records concerning AMEX Home Mortgage Corporation on file

with the Secretary of State for the Commonwealth of Massachusetts.

O'Donnell also agrees to stipulate to the following facts:

9.  Countrywide Bank, FSB was a financial institution and its deposits were insured by the Federal Deposit Insurance Corporation at the time of the events alleged in the Indictment; and

10. At all times relevant to this case, AMEX Home Mortgage Corporation was owned and operated by defendant Michael P. O'Donnell and his wife, Eileen O'Donnell.

Defendant's Signature: _____

Date:        MICHAEL P. O'DONNELL

       _____

Approved: _____

Date:        JEFFREY A. DENNER

       _____

6

# EXHIBIT 2

## Joseph Keller

| | |
|---|---|
| **From:** | Michael O'Donnell▮▮▮▮▮▮▮@gmail.com> |
| **Sent:** | Wednesday, April 08, 2015 11:30 AM |
| **To:** | Joseph Keller |
| **Subject:** | Re: FW: US v. O'Connor; Countrywide loan document |
| **Attachments:** | Stipulation (disbursement checks).pdf |

Joe:
I have an issue with the wording on the Stipulation Disbursement Checks

"for the Countrywide Bank, FSB loan closing on April 20, 2007.

This is probably what you where talking about
Let me know
Thanks
Mike O

On Wed, Apr 8, 2015 at 11:11 AM, Joseph Kelle▮▮▮▮▮@dennerlaw.com> wrote:

**From:** Lei, Veronica (USAMA) [mailto:▮▮▮▮▮@usdoj.gov]
**Sent:** Wednesday, April 08, 2015 10:00 AM
**To:** Balthazard, Mark (USAMA); Joseph Keller; Jeffrey Denner
**Subject:** RE: US v. O'Connor; Countrywide loan document

Hi, Jeffrey and Joe:  Attached please find the final versions of our stipulations.  We gave you copies of these several weeks ago with hard copies of the exhibits attached, and you had agreed that they were fine.  Since I need to file these, can you please let me know of your final sign off ASAP, and I'll file as soon as I hear from you?  Thanks much.

-Veronica

**Veronica M. Lei**

Assistant U.S. Attorney

U.S. Attorney's Office

1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA        )
                                )
            v.                  )        Criminal Case No. 13-10262-DPW
                                )
MICHAEL P. O'DONNELL,           )
            Defendant.          )

## STIPULATION

The parties agree as follows:

1.      The documents marked as Exhibit 5.00 are true and accurate copies of authentic

business records, as defined by Rule 803(6) of the Federal Rules of Evidence, of McGonagle &

McGonagle, P.C. and consist of disbursement checks, obtained from Sovereign Bank, N.A., for

the Homecomings Financial, LLC (f/k/a Homecomings Network, Inc.), loan closing on March 7,

2007.

2.      The documents marked as Exhibit 4.00 are true and accurate copies of authentic

business records, as defined by Rule 803(6) of the Federal Rules of Evidence, of McGonagle &

McGonagle, P.C. and consist of disbursement checks, obtained from Sovereign Bank, N.A., for

the Countrywide Bank, FSB loan closing on April 20, 2007.

Respectfully submitted,                          Respectfully submitted,

MICHAEL P. O'DONNELL                              CARMEN M. ORTIZ
                                                  United States Attorney


By:    /s/ Jeffrey A. Denner              By:    /s/ Veronica M. Lei
       JEFFREY A. DENNER                          MARK J. BALTHAZARD
       BBO # 120520                               BBO # 544463
       jdenner@dennerlaw.com                      Mark.Balthazard@usdoj.gov
       JOSEPH G. KELLER , JR.                     VERONICA M. LEI
       BBO # 686689                               BBO # 673122
       jkeller@dennerlaw.com                      Veronica.Lei@usdoj.gov
       Denner Pellegrino LLP                      Assistant U.S. Attorneys
       Four Longfellow Place                      U.S. Attorney's Office
       Suite 3501, 35th Floor                     1 Courthouse Way, Suite 9200
       Boston, MA 02114                           Boston, MA  02210
       (617) 227-2800                             (617) 748-3100

Date: April 8, 2015

2